IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOAN ORIE MELVIN,
                Petitioner,

           V.                  CIVIL ACTION NO. 15-1225

STEPHEN   D.   ZAPPALA,   DISTRICT
ATTORNEY  OF  ALLEGHENY  COUNTY
and  FRANK  J.  SCHERER,  DIRECTOR,
ALLEGHENY COUNTY PROBATION
              Respondents.    ELECTRONICALLY FILED

COMMONWEALTH'S ANSWER TO
PETITION FOR WRIT OF HABEAS CORPUS

AND   NOW,   to-wit   this   16th   day   of   November,   2015,   comes   the

Commonwealth of Pennsylvania by its attorneys STEPHEN A. ZAPPALA, JR., District

Attorney  of  Allegheny  County,  Pennsylvania,  and  RONALD  M.  WABBY,  JR.,  Deputy

District  Attorney,  and  in  answer  to  the  above-captioned  Petition  for  Writ  of  Habeas

Corpus, respectfully shows:

        1.    Petitioner, Joan Orie Melvin[1], was charged by Criminal Information filed in

the Court of Common Pleas of Allegheny County, Criminal Division. At CC 201209885[2],

---

[1]      Joan  Orie  Melvin  was  formally  a  Justice  on  the  Supreme  Court  of
      Pennsylvania  and  a  Judge  on  the  Superior  Court  of  Pennsylvania  and  the
      Court of Common Pleas of Allegheny County.

[2]      A  copy  of  the  docket  sheet  is  attached  hereto,  incorporated  herein,  and
      marked as Commonwealth Exhibit 1; (APP 1-24). Numerals in parentheses
      preceded  by  the  letters  "APP"  refer  to  pages  of  the  Commonwealth's
      Exhibits. The Department of Court Records, Criminal Division will transmit its
      file for this case.

**VOLUME I**

petitioner was charged with three (3) counts of Theft of Services[3], two (2) counts of Criminal Conspiracy[4], one (1) count of Misapplication of Entrusted Property and Property of Government or Financial Institutions[5], and one (1) count of Official Oppression[6]. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 2) (APP 25-31). Petitioner's charges were filed following a grand jury investigation. Petitioner's case was joined with her sister, Janine Orie[7].

On July 2, 2012, petitioner, through Daniel T. Brier, Esquire, Patrick A. Casey, Esquire, and Donna A. Walsh, Esquire, filed a Petitioner's Joan Orie Melvin's Motion for Expedited Consideration of Application for Extraordinary Relief and an Application for Extraordinary Relief (Including a Stay of Proceedings) Pursuant to King's Bench Powers and/or Plenary Jurisdiction in the Supreme Court of Pennsylvania, which was docketed at **No. 37 WM 2012**[8]. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 4 and 5) (APP 34-39; 40-59). On July 3, 2012, the Commonwealth, through Assistant District Attorney Lawrence N. Claus, Esquire, filed a Commonwealth's Response to Criminal Defendant's Application for Extraordinary Relief

---

[3]    18 Pa.C.S.A. §3926

[4]    18 Pa.C.S.A. §903

[5]    18 Pa.C.S.A. §4113

[6]    18 Pa.C.S.A. §5301

[7]    Janine Orie's case was originally joined with that of her sister, Jane Orie, but Ms. Orie's case was severed prior to Jane Orie's second trial. *See* **Civil Action No. 15-1153**.

[8]    A copy of the docket sheet is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 3 (APP 32-33).

Pursuant to King's Bench Powers and/or Plenary Jurisdiction. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 6) (APP 60-67). On July 17, 2012, the Supreme Court denied the application. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 7) (APP 68).

On August 1, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Motion for Joinder. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 8) (APP 69-75).

On August 8, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Memorandum of Law in Opposition to Motion for Joinder. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 9) (APP 76-140). On August 12, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Brief in Support of Commonwealth's Motion for Joinder. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 10) (APP 141-147).

On August 14, 2012, an argument was held before the Honorable Jeffrey A. Manning[9]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. James DePasquale, Esquire represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney William J. Becker, Esquire represented the Commonwealth.

On August 21, 2012, petitioner, through Attorney Brier, Attorney Casey, and

---

[9]   Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

Attorney Walsh, filed a Defendant's Request for a Bill of Particulars. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 11) (APP 148-152).

On August 23, 2012, Judge Manning filed a Memorandum Opinion, which granted the Commonwealth's Motion for Joinder. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 12) (APP 153-169). Also, Judge Manning entered an Order of Court reassigning petitioner's case. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 13) (APP 170-173).

On August 27, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Response to Defendant's Request for a Bill of Particulars. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 14) (APP 174-181).

On August 27, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Motion to Compel Discovery. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 15) (APP 182-192).

On September 4, 2012, petitioner, Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Motion to Continue Pretrial Motion Deadline and Defendant's Motion for Bill of Particulars. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 16 and 17) (APP 193-197; 198-221).

On September 11, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Response to Defendant's Motion to Compel Discovery. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 18) (APP 222-230).

On September 14, 2012, a status conference was held before the Honorable Lester G. Nauhaus[10]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Becker represented the Commonwealth.

On September 21, 2012, a status conference was held before Judge Nauhaus[11]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Becker represented the Commonwealth.

On October 26, 2012, a status conference was held before Judge Nauhaus[12]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Assistant District Attorney Claus and Assistant District Attorney Becker represented the Commonwealth.

On October 29, 2012, Judge Nauhaus issued an Order directing the Commonwealth to provide petitioner with copies of the relevant grand jury transcripts. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit

---

[10] Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

[11] Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

[12] Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

19) (APP 231). Also, Judge Nauhaus issued Orders directing the Senate Republican Caucus and the Administrative Office of the Pennsylvania Courts to make all electronic evidence available for examination by petitioner. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 20 and 21) (APP 232; 233).

On November 2, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Motion for Reconsideration and a Commonwealth Response to Defendant's Request of a Bill of Particulars and Court's Directive to Specify Overt Acts. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 22 and 23) (APP 234-273; 274-318).

On November 5, 2012, Judge Nauhaus filed an Order of Court modifying the Order for the grand jury transcripts. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 24) (APP 319-320). On November 7, 2012, Judge Nauhaus issue an Order of Court denying the Commonwealth's Motion for Reconsideration as moot. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 25) (APP 321-322).

On November 13, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Motion to Dismiss Conspiracy Charges Due ot Commonwealth's Failure to Provide a Bill of Particulars or, in the Alternative, to Compel a Proper Bill of Particulars. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 26) (APP 323-340).

On November 19, 2012, a status conference was held before Judge Nauhaus[13]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Becker represented the Commonwealth.

On November 19, 2012, the Administrative Office of Pennsylvania Courts, through A. Taylor Williams, Esquire and Michael Daley, Esquire, filed a Motion to Quash Subpoenas Duces Tecum and for Protective Order and a Motion for Reconsideration of the Court's October 29, 2012 Order and for a Protective Order. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 27 and 28) (APP 341-384; 385-423).

On November 19, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Petition for the Rendition of Out-of-State Witness. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 29) (APP 424-430).

On November 26, 2012, petitioner, through Attorney Casey, filed a letter. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 30) (APP 431-434).

On November 28, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Request of the Accused Pursuant to Pa.R.Evid. 404(b)(4). (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 31)

---

[13]   Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

(APP 435-436).

On November 29, 2012, petitioner, through Attorney Casey, filed a Defendant's Memorandum of Law in Opposition to Motion to Quash and In Support of Request to Compel Production.  (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 32) (APP 437-463).

On December 6, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Notification of Commonwealth's Intention to Present Evidence of Other Crimes, Wrongs, or Acts Pursuant to Rule 404(B)(2) and Rule 404(B)(4) of the Pennsylvania Rules of Evidence.  (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 33) (APP 464-468).

On December 7, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Omnibus Pretrial Motion and a Defendant's Memorandum of Law in Support of Omnibus Pretrial Motion Pursuant to Pa.R.Crim.P. 578. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 34 and 35) (APP 469-472; 473-705).

On December 7, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Motion in Support of the Motion to Quash Subpoenas Filed by the Administration Office of the Pennsylvania Courts and a Commonwealth's Motion for Pretrial Discovery and/or Inspection. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 36 and 37) (APP 706-712; 713-720).

Also, on December 7, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a letter, which was a notice of petitioner's intention to

introduce an alibi defense. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 38) (APP 721-722).

On December 14, 2012, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Motion to Exclude Alibi Evidence and a Commonwealth's Response to Defendant's Omnibus Pretrial Motion. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 39 and 40) (APP 723-731; 732-848).

On December 14, 2012, a status conference was held before Judge Nauhaus[14]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Deputy District Attorney Diane Berman, Esquire represented the Commonwealth.

On December 19, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Pretrial Motion Concerning Courtroom Designation and Jury Selection and a Defendant's Reply Memorandum in Further Support of Omnibus Pretrial Motion Pursuant to Pa.R.Crim.P. 578. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 42 and 43) (APP 876-893; 894-933).

On December 20, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Response to Commonwealth's Notification of Intention to Present Evidence of Other Crimes, Wrongs, or Acts Pursuant to Rule

---

[14]   A copy of the transcript is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 41; (APP 849-875). Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date.

404(b)(2) and Rule 404(b)(4) of the Pennsylvania Rules of Evidence. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 44) (APP 934-942).

On December 21, 2012, petitioner and Janine Orie appeared before Judge Nauhaus and the Honorable John A. Zottola for a Motion Hearing[15]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Yifat Shaltiel, Esquire represented the Commonwealth.

On December 31, 2012, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Motion for Approval of Method to Distribute and Maintain Juror Information Questionnaire. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 46) (APP 997-1007).

On January 2, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Response to Defendant's Pretrial Motion for Approval of Method to Distribute and Maintain Juror Questionnaire. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 47) (APP 1008-1016).

On January 4, 2013, petitioner and Janine Orie appeared before Judge Nauhaus for a status conference[16]. Attorney Brier, Attorney Casey, and Attorney Walsh

---

[15]     A copy of the transcript is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 45; (APP 943-996). Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date.

[16]     A copy of the transcript is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 48; (APP 1017-1036). Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date.

represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Becker represented the Commonwealth.

On January 7, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed an Application for Extraordinary Relief Pursuant to King's Bench Powers and/or Plenary Jurisdiction and for Expedited Consideration of Application in the Supreme Court of Pennsylvania, which was docketed at **No. 1 WM 2013**[17]. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 50) (APP 1040-1060). On January 9, 2013, the Commonwealth, through Deputy District Attorney Michael W. Streily, Esquire, filed a Commonwealth's  Response to Application for Extraordinary Relief Pursuant to King's Bench Powers and/or Plenary Jurisdiction and for Expedited Consideration of Application. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 51) (APP 1061-1073). On January 10, 2013, the Supreme Court denied the application. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 52) (APP 1074).

Meanwhile, on January 8, 2013, the Honorable Donna Jo McDaniel denied petitioner's juror questionnaire motion. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 53) (APP 1075).

On January 10, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Response to Defendant's Request for Access to Original Evidence and Commonwealth's Objection to Defense Proposed Juror Information Questionnaire. (Copies are attached hereto, incorporated herein, and

---

[17]     A copy of the docket sheet is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 49 (APP 1037-1039).

marked as Commonwealth Exhibits 54 and 55) (APP 1076-1084; 1085-1092).

On January 11, 2013, petitioner and Janine Orie appeared before Judge Nauhaus and Judge Zottola for a Motion Hearing[18]. Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Lisa Mantella, Esquire represented the Commonwealth.

On January 16, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Response to Commonwealth's Motion for Pretrial Discovery and/or Inspection. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 57) (APP 1118-1129).

On January 17, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Motion in Limine. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 58) (APP 1130-1137).

On January 18, 2013, petitioner and Janine Orie appeared before Judge Nauhaus for a Motion Hearing[19]. Attorney Casey represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Deputy District Attorney Berman represented the Commonwealth.

On January 18, 2013, petitioner, through Attorney Brier, Attorney Casey, and

---

[18]   A copy of the transcript is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 56; (APP 1093-1117). Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date.

[19]   Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

Attorney Walsh, filed a Defendant's Motion in Limine. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 59) (APP 1138-1143).

On January 22, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Memorandum of Law in Support of Motion in Limine. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 60) (APP 1144-1831).

On January 22, 2013, the Commonwealth, through Deputy District Attorney Berman, filed a Commonwealth Response to Defendant's Motion in Limine. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 61) (APP 1832-1839).

On January 24, 2013 through February 15, 2013, petitioner and Janine Orie appeared before Judge Nauhaus and proceeded to a jury trial[20]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Mantella represented the Commonwealth.

On February 4, 2013, during trial, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Motion to Dismiss Criminal Charges Due to Prosecutorial Misconduct. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 62) (APP 1840-1880). On February 4, 2013, Judge Nuahaus denied the motion. (A copy is attached hereto, incorporated herein, and

---

[20] Numerals in parentheses preceded by the letters "TT" refer to pages of the Jury Transcript dated January 24, 2013 through February 15, 2013. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

marked as Commonwealth Exhibit 63) (APP 1881).

On February 21, 2013, petitioner was found guilty of three (3) counts of Theft of Services, two (2) counts of Criminal Conspiracy and one (1) Count of Misapplication of Entrusted Property and Property of Government or Financial Institutions. The jury was unable to reach a verdict as to one (1) count of Official Oppression.  Sentencing was deferred pending a pre-sentence report.

On April 15, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Memorandum Sentencing. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 64) (APP 1882-1986). On April 15, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant Joan Orie Melvin's Sentencing Memorandum.  (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 65) (APP 1987-2039).

On May 6, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Memorandum Regarding Defendant's State Employees Retirement System Account. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 66) (APP 2040-2045).

On May 7, 2013, petitioner and Janine Orie appeared before Judge Nauhaus for sentencing[21].  Attorney Brier, Attorney Casey, and Attorney Walsh represented

---

[21]   Numerals in parentheses preceded by the designation "ST1" refer to pages of the Sentencing Hearing transcript dated May 7, 2013. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Mantella represented the Commonwealth.   At Count 1, Theft of Services, petitioner was sentenced to three (3) years of intermediate punishment. At Count 3, Theft of Services, petitioner was sentenced to three (3) years of intermediate punishment, concurrent to Count 1. At Count 4, Criminal Conspiracy, petitioner was sentenced to three (3) years of intermediate punishment, concurrent to Count 1. At Count 5, Misapplication of Entrusted Property and Property of Government or Financial Institutions, petitioner was sentenced to two (2) years of probation, consecutive to Count 1.  At Count 7, Criminal Conspiracy, petitioner was sentenced to two (2) years of probation, concurrent to Count 5. Petitioner was ordered to pay all applicable fines and costs. Further, petitioner was ordered to send an apology letter on a photograph to all sitting judges in Pennsylvania and her staff.

On May 13, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Commonwealth's Motion Regarding Restitution, Court Costs, and Costs of Prosecution. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 67) (APP 2046-2063).

On May 14, 2013, petitioner and Janine Orie appeared before Judge Nauhaus for resentencing[22]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Attorney DePasquale represented Janine Orie. Assistant District Attorney Claus and Assistant District Attorney Mantella represented the Commonwealth.   At

---

[22]   A copy of the transcript is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 68; (APP 2064-2086). Numerals in parentheses preceded by the designation "ST2" refer to pages of the Sentencing Hearing transcript dated May 14, 2013.

Count 1, Theft of Services, petitioner was sentenced to one (1) year of intermediate punishment. At Count 3, Theft of Services, petitioner was sentenced to one (1) year of intermediate punishment, consecutive to Count 1. At Count 4, Criminal Conspiracy, petitioner was sentenced to one (1) year of intermediate punishment, consecutive to Count 3. At Count 5, Misapplication of Entrusted Property and Property of Government or Financial Institutions, petitioner was sentenced to two (2) years of probation, consecutive to Count 4.  At Count 7, Criminal Conspiracy, petitioner was sentenced to two (2) years of probation, concurrent to Count 5. Petitioner was ordered to pay all applicable fines, costs, and restitution. Further, petitioner was ordered to send an apology letter on a photograph to all sitting judges in Pennsylvania and her staff.

On May 20, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Notice of Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 69) (APP 2084-2104).

On May 23, 2013, the Commonwealth, through Assistant District Attorney Claus, filed a Memorandum of Law addressing the apology letters. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 70) (APP 2105-2110). On May 24, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant Joan Orie Melvin's Reply to Commonwealth's Memorandum. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 71) (APP 2111-2114).

On June 13, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant's Joan Orie Melvin's Statement of Errors Complained of on Appeal Pursuant to Pa.R.App.P. 1925(b). (A copy is attached hereto, incorporated

herein, and marked as Commonwealth Exhibit 72) (APP 2115-2119). On September 12, 2013, Judge Nauhaus filed his Opinion. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 73) (APP 2120-2151).

On September 27, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed an Appellant's Application for Stay of Portion of Criminal Sentence Requiring Her to Write Letters Apology Pending Disposition of this Direct Appeal in the Superior Court of Pennsylvania, which was docketed at **No. 844 WDA 2013**[23]. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 75) (APP 2161-2301). On October 2, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed an Appellant's Motion for Emergency Stay and for Expedited Consideration of Application for Stay of Part of Criminal Sentence Requiring Apology Letters Pending Disposition of Direct Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 76) (APP 2302-2310). On October 2, 2013, the Superior Court granted petitioner a temporary stay. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 77) (APP 2311). On October 8, 2013, the Commonwealth, through Deputy District Attorney Streily, filed a Commonwealth's Response to Appellant's Motion for Emergency Stay of the Honorable Lester G. Nauhaus' Sentencing Order Requiring Letters of Apology as a Condition of Appellant's Sentence of County Intermediate Punishment (House Arrest with Electronic Monitoring).  (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 78) (APP 2312-2331). On October 11, 2013,

---

[23]    A copy of the docket sheet is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 74 (APP 2152-2160).

petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed an Appellant's Reply in Further Support of Application for Stay of Portion of Criminal Sentence Requiring Her to Write Letters of Apology Pending Disposition of this Direct Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 79) (APP 2332-2342).

On October 15, 2013, petitioner appeared before Judge Nauhaus for a probation violation hearing[24]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Assistant District Attorney Claus and Assistant District Attorney Mantella represented the Commonwealth. Judge Nauhaus scheduled a further probation hearing.

On November 6, 2013, the Superior Court granted the stay of the portion of sentence that required petitioner to write apology letters. *Commonwealth v. Orie Melvin*, 79 A.3d 1195 (Pa.Super. 2013).  (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 80) (APP 2343-2351).

On November 7, 2013, Judge Nauhaus entered an Order of Court scheduling a hearing. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 81) (APP 2352-2353).

On November 12, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed an Appellant's Application for Emergency Relief Enforcing Stay Granted by This Court on November 6, 2013 and Voiding Trial Court Order dated November 7, 2013 Scheduling "A Hearing on Adjustments to [Appellant's] Sentence in

---

[24]     Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

the Superior Court of Pennsylvania, which was docketed at **No. 844 WDA 2013**. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 82) (APP 2354-2347). On November 13, 2013, the Superior Court denied the application. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 83) (APP 2398).

On November 14 and 15, 2013, petitioner appeared before Judge Nauhaus for a probation violation hearing[25]. Attorney Brier, Attorney Casey, and Attorney Walsh represented petitioner. Assistant District Attorney Claus and Assistant District Attorney Mantella represented the Commonwealth. Following the proceedings, Judge Nauhaus stayed petitioner's sentence until the conclusion of the appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 84) (APP 2399-2400).

On December 3, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at **No. 844 WDA 2013**. This brief was corrected on January 27, 2014. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 85) (APP 2401-2593). On appeal, petitioner raised the following claims:

> I.   Whether the criminal charges against Orie Melvin are unconstitutional because they infringe on the Judiciary's exclusive power to supervise the courts under Article 5, Section 10 of the Pennsylvania Constitution?
>
> II.   Whether it violated due process to base criminal

---

[25]   Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

charges on alleged violations of an internal court rule governing conduct by court employees?

III.    Whether the warrant authorizing the seizure of Orie Melvin's entire private email account was unconstitutionally overbroad in violation of the Fourth Amendment and Article 1, Section 8 of the Pennsylvania Constitution?

IV.    Whether it was error to decline to appoint an out-of county judge to preside over this matter involving Orie Melvin who is a former member of the Allegheny County bench and where a key prosecution witness is the wife of a sitting Allegheny County judge?

V.    Whether the extension of the statute of limitations for "public officers or employees" in 42 Pa.C.S.A. §5552(c) applies to "Judicial officers" like Orie Melvin?

VI.    Whether the criminal charges against Orie Melvin should have been dismissed with prejudice as a sanction for the Commonwealth for the prosecutor's knowing introduction of false evidence and subornation of perjury?

VII.    Whether the case against Orie Melvin was properly joined with the cases against her sister, Janine Orie, where the charges are factually inconsistent and each faces charges not file against the other?

VIII.    Whether Orie Melvin had the right to have her expert examine original electronic evidence seized by the District Attorney from the office of former State Senator Jane Orie?

IX.    Whether Orie Melvin had the right to have her expert examine original electronic evidence in the possession of the Superior Court which was searched at the request of the District Attorney?

X.    Whether Orie Melvin's request for habeas corpus relief should have been granted as the result of the Commonwealth's failure to make out a prima facie case on the theft of services, misapplication of government property and conspiracy charges at the preliminary hearing?

XI.    Whether the trial court erred in excluding relevant evidence relating to the productivity of Orie Melvin's judicial chambers as a means of negating the theft or diversion

element of the theft of services charges?

XII.    Whether the trial court deprived Orie Melvin of a fair trial by offering personal opinions and improperly commenting on the evidence in front of the jury?

XIII.    Whether the trial court erred in concluding that the evidence at trial was sufficient to support a conviction for theft of services, misapplication of government property and conspiracy?

XIV.    Whether it was error for the trial court to instruct the jury on the issue of accomplice liability after the jury started deliberations?

XV.    Whether the trial court erred constitutionally, legally, and procedurally in attempting to require Orie Melvin to write letters of apology as part of her criminal sentence while she continues to maintain her innocence?

On February 7, 2014, the Commonwealth, through Deputy District Attorney Streily, filed a Brief for Appellee. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 86) (APP 2594-2702). On March 24, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Reply Brief for Appellant. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 87) (APP 2703-2751).

Meanwhile, on December 13, 2013, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Notice of Appeal, from Judge Nauhaus' Order staying petitioner's sentence. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 88) (APP 2752-2776). On January 8, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Defendant Joan Orie Melvin's Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b). (A copy is attached hereto, incorporated herein, and marked as

Commonwealth Exhibit 89) (APP 2777-2779). On March 24, 2014, Judge Nauhaus filed his Opinion.   (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 90) (APP 2780-2786). This appeal was docketed in the Superior Court of Pennsylvania at **No. 1974 WDA 2013**[26].

On April 30, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed an Appellant's Application for Consolidation of Appeals Pursuant to Pa.R.A.P. 513 and Appellant's Application for Recusal. (Copies are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 92 and 93) (APP 2792-2797; 2798-2802). On April 30, 2014, the Commonwealth, through Deputy District Attorney Streily, filed a Commonwealth's Response to Application for Recusal and Application for Consolidation and Commonwealth's Request that this Honorable Court Decide Said Applications *En Banc* and in an Expedited Fashion. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 94) (APP 2803-2810). On May 1, 2014, the Superior Court ordered that petitioner's appeals be consolidated. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 95) (APP 2811-2812). On May 2, 2014, the Superior Court denied petitioner's request for recusal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 96) (APP 2813).

On May 12, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at **No. 1974 WDA 2013**. (A copy is attached hereto, incorporated herein,

---

[26]   A copy of the docket sheet is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 91 (APP 2787-2791).

and marked as Commonwealth Exhibit 97) (APP 2814-2878). On appeal, petitioner raised the following claims:

> I.    Whether the trial court lacked jurisdiction and authority to <u>sua sponte</u> suspend Orie Melvin's entire sentence while all conditions of county intermediate punishment were satisfied and while Orie Melvin's direct appeal was pending in this Court?
>
> II.   Whether the trial court violated Orie Melvin's rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Pennsylvania Constitution by <u>sua sponte</u> staying her criminal sentence after jeopardy attached?

On May 19, 2014, the Commonwealth, through Deputy District Attorney Streily, filed a Brief for Appellee. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 98) (APP 2879-2909). On May 30, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Reply Brief for Appellant. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 99) (APP 2910-2922).

Both of petitioner's cases were argued before the Superior Court of Pennsylvania on May 20, 2014.

On May 22, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a post argument submission, which contained a partial list of e-mails. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 100) (APP 2933-2972). On May 23, 2014, the Commonwealth, through Deputy District Attorney Streily, filed a Commonwealth's Objection pursuant to Pa.R.A.P. 2501 to the manner of Appellant's post oral argument communication to Panel 16-ARGUMENT-2014-2. (A copy is attached hereto, incorporated herein, and marked as

Commonwealth Exhibit 101) (APP 2973-2978). On May 28, 2014, the Superior Court incorporated the e-mails into the record. On August 21, 2014, the Superior Court affirmed the case in part and reversed in part. *Commonwealth v. Orie Melvin*, 103 A.3d 1 (Pa.Super. 2014). (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 102) (APP 2979-3028). The Superior Court affirmed petitioner's conviction, but reversed the portion of the sentence that required apology letters on a photograph and the trial court's stay of the sentence.

On September 22, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Petition for Allowance of Appeal in the Supreme Court of Pennsylvania, which was docketed at **No. 440 and 441 WAL 2014**[27]. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 105) (APP 3035-3243). In the petition, petitioner raised the following claims:

> I.      Whether the Superior Court's first impression in this case conflicts with well-settled authority from this Court which holds that this Court has the exclusive power to supervise the courts under Article V, §10 of the Pennsylvania Constitution?
>
> II.      Whether the Superior Court erred in failing to recognize that criminal charges based on standards in an internal work rule violate the right to due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I §9 of the Pennsylvania Constitution?
>
> III.      Whether the Superior Court erred in concluding that the seizure of a private email account pursuant to an overbroad warrant was harmless without considering the extent to which other evidence in the case derived from

---

[27]      Copies of the docket sheets are attached hereto, incorporated herein, and marked as Commonwealth Exhibits 103 and 104. (APP 3029-3031; 3032-3034).

illegally seized evidence and without affording Orie Melvin a hearing to establish that the other evidence is the fruit of the poisonous tree, all in violation of controlling authority from the United States Supreme Court?

IV.    Whether the Superior Court erred in ruling in a case of first impression that the extension of the criminal statute of limitations for "public officer[s] or employee[s]" in 42 Pa.C.S.A. §5552(c)(2) also applies to "Judicial officers"?

V.    Whether the Superior Court erred in failing to recognize that Orie Melvin has a right under <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963), to potentially exculpatory evidence seized from the legislative office of former State Senator Jane Orie and potentially exculpatory evidence in the possession of the Superior Court, which was searched at the request of the District Attorney?

VI.    Whether the Superior Court erred in finding as a matter of first impression that a defendant is obligated to specifically request supplemental argument in order to preserve a challenge to an untimely jury instruction and in finding that it was harmless error for the trial court in this case to instruct the jury on the issue of accomplice liability after the jury started deliberations?

VII.    Whether the Superior Court erred in finding as a matter of first impression that a defendant may be required to write letters of apology as a condition of a criminal sentence?

Also, on September 22, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Petitioner's Application for Stay of Portion of Criminal Sentence Requiring Her to Write Letters of Apology Pending Disposition of Direct Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 106) (APP 3244-3385). On September 30, 2014, the Commonwealth, through Deputy District Attorney Streily, filed a Commonwealth's Response to Application for Stay of Portion of Criminal Sentence Requiring Her to Write Letters of Apology Pending Disposition of

Direct Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 107) (APP 3386-3403). On October 3, 2014, the Commonwealth, through Deputy District Attorney Streily, filed a "no answer" letter in response to the Petition for Allowance of Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 108) (APP 3404).  On October 7, 2014, the Supreme Court stayed petitioner's entire sentence pending the resolution of the appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 109) (APP 3405-3406). On October 28, 2014, petitioner, through Attorney Brier, Attorney Casey, and Attorney Walsh, filed a Petitioner's Praecipe for Discontinuance of Petition for Allowance of Appeal. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 110) (APP 3407-3414). On October 28, 2014, the petition was discontinued. (A copy is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 111) (APP 3415-3416).

On November 4, 2014, petitioner appeared before Judge Nauhaus. Attorney Casey represented petitioner[28]. Assistant District Attorney Claus represented the Commonwealth. Following the proceeding, petitioner was ordered to begin serving her sentence.

On September 18, 2015, petitioner, through Attorney Casey, Attorney Walsh, and Suzanne P. Conaboy, Esquire, filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. §2254 and a Petitioner's Memorandum of Law in Support of Petition for Writ of

---

[28]   Numerals in parentheses preceded by the designation "HT, *date*," refer to pages of the hearing transcript occurring on that particular date. A transcript of this proceeding will be transmitted by the Department of Court Records, Criminal Division.

Habeas Corpus Pursuant to 28 U.S.C. §2254, which are currently docketed in the

United States District Court for the Western District of Pennsylvania at **Civil Action 15-**

**1225**.

> 2.     Judge Nauhaus summarized the facts of the case as follows:

>> At Count 1, the defendant is charged with having control over the disposition of services of her Superior Court Judicial staff, which during 2003 and 2009, she personally and through accomplices Janine Orie and Jane Clare Orie, utilized to facilitate and promote her political campaign, to which she was not entitled, and knowingly diverted such services for her own benefit and the value of the services was greater than $2,000.00.

>> The defendant had control over the disposition of services of judicial staff employee Lisa Sasinoski, and was not entitled to use Ms. Sasinoski's services for political work, yet defendant knowingly diverted the services of Ms. Sasinoski for her own benefit. All Superior Court judicial employees were prohibited from participating in political activity. Ms. Sasinoski testified that her judicial responsibilities included writing memorandum and opinions and proofreading other law clerks memorandum and opinions. (TT at 1073). Her responsibilities as a judicial staff employee for the Pennsylvania Superior Court did not, and could not, involve political tasks. However, between January 2003 and October 2003, 25% to 35% of Ms. Sasinoski's time was spent performing political campaign related tasks for the defendant while she was paid by the Commonwealth as a judiCial staff employee for the Pennsylvania Superior Court. (TT at 1193).

>> Ms. Sasinoski performed the political tasks because she wanted to please the defendant and keep her job. (TT at 1105). The defendant had hired her and could terminate her employment at any time. Ms. Sasinoski was requested to perform the political tasks by either the defendant herself or through Janine Orie on the defendant's behalf. Everyone in the office knew that Janine's request to perform political work was a directive from the judge. (TT at 1074).

>> Political tasks and events became part of the duties that the defendant expected her to complete. (TT at 1214-

1215). Ms. Sasinoski attended many political events with the defendant, often on week-days during normal working hours. (TT at 1093-1097). The defendant or Janine Orie would either stop by Ms. Sasinoski's office to request that she attend a political event or they would write her a note. (TT at 1106).

Ms. Sasinoski also wrote speeches during working hours and printed them in the office. (TT at 1099). She worked on questionnaires and compiled case lists to satisfy various political special interest groups. (TT at 1100-1101). Among other tasks, Ms. Sasinoski helped develop an Excel spreadsheet on the computers of the judicial chambers to track campaign contributors. (TT at 1114 - 1121).

During the 2003 political season, Ms. Sasinoski worked for the defendant and spent at least 25% of her day performing political work. (TT at 1193). The computation used to value the services of judicial employees Lisa Sasinoski and Kathy Squires considered their salary without fringe benefits, using a 35 hour work-week, and the minimal percentage of time that the employee spent each day performing political campaign work. (TT at 2025). The value of the political campaign work performed by Ms. Sasinoski in 2003 while she was a paid government judicial employee was $10,267.60. (TT at 2043).

Judicial employee Kathy Squires also did a significant amount of political campaign work during work-day hours. Ms. Squires worked for the defendant during the 2003 and 2009 political seasons. She was employed by the Pennsylvania Superior Court as a judicial secretary for the defendant. Ms. Squires worked 8:30 a.m. to 4:30 p.m., with an hour for lunch. (IT at 1641-1642). Her responsibilities as a judicial secretary included typing, filing, answering the telephone, taking care of legal books, and opening and distributing the mail. (TT at 1604).

During 2003 and 2009, Ms. Squires was given additional duties which benefitted the defendant's political campaign. (TT at 1605). Janine directed that Ms. Squires complete these duties, although the defendant was Ms. Squire's actual supervisor (TT at 1606). Ms. Squires was required to work on campaign contribution spreadsheets, campaign expense reports, and other campaign tasks. (TT at 1608). She prepared a thousand or more thank you letters

for the defendant's political campaign. (TT at 1630). Ms. Squires spent three hours of her day on campaign related activities during most of 2003. (TT at 1614). From January to November of 2009, Ms. Squires spent five hours a week on campaign related activities. (TT at 1614-1615). The value of the political campaign work performed by Ms. Squires while she was paid as a government judicial employee was $8,961.18 in 2003 and $3,399.15 in 2009. (TT at 2045).

The total amount of political work performed by Superior Court Judicial staff employees Lisa Sasinoski and Kathy Squires and paid by the government in 2003 and 2009 was $22,627.93. (TT at 2048).

As specified above, there was sufficient evidence to support the conviction at Count 1 for theft of services. The evidence proved that the defendant had control over the disposition of the services of Ms. Sasinoski and Ms. Squires, which in 2003 and 2009 she used to facilitate and promote her political campaign, to which she was not entitled, and knowingly diverted such services to her own benefit and the value of the services was greater than $2,000.00.

At Count 2 the defendant is charged with having control over the disposition of services of Janine Orie, which during 2003 and 2009, she utilized to facilitate and promote the defendant's political campaigns, to which she was not entitled, and knowingly diverted such services to her own benefit, and the value of the services was greater than $2,000.00.

Janine Orie was extremely involved in the defendant's 2003 and 2009 political campaigns while she was employed by the Pennsylvania Superior Court as the head judicial secretary for the defendant's chambers. (TT at 1074 - 1076). As an employee of the Pennsylvania Superior Court, Janine Orie was prohibited from any involvement with the defendant's political campaign. Janine Orie spent many hours performing political tasks and delegating political work tor other employees to complete. (TT at 1606 1610 1625). Ms. Squires testified that Janine Orie was very busy at the defendant's chambers performing political campaign responsibilities. (TT at 1629). She appeared to run the campaign, as the defendant's campaign manager. (TT at 1087 1227 1629). Janine Orie was the person Jamie Pavlot would speak with on a regular basis regarding campaign

tasks when the defendant was not available. (TT at 210). Janine Orie kept a calendar with the defendant's campaign related events at the office. (TT at 1110).

Janine Orie sent numerous emails to the Senatorial staff of Jane Clare Orie. The campaign duties that Mr. Dott was required to complete were assigned by Jamie Pavlot and Janine Orie. (TT at 887).

There was overwhelming evidence to prove that the defendant had control over the disposition of services of Janine Orie, which during 2003 and 2009, she utilized to facilitate and promote the her political campaign, to which she was not entitled, and knowingly diverted such services to her own benefit, and the value of the services was greater than $2,000.00.

At Count 3 the defendant is charged with having control over the disposition of services of the Senatorial staff of Jane Clare Orie, which during 2003 and 2009, she personally and through accomplices Janine Orie and Jane Clare Orie, utilized to  facilitate and promote the defendant's political campaigns, to which she was not entitled, and knowingly diverted such services to her own benefit, and the value of the services was greater than $2,000.00.

The Senatorial staff of Jane Clare Orie was required to work 37.5 hours a week. The value of the services diverted to benefit the defendant was based on the salary of the senate employee, the percentage of time spent on political campaign work, and a 37.5 hour work-week. (TT at 601,2025). This computation was used for Senate employees Jamie Pavlot, Barbara Brown, Jason Davidek, Joshua Dott and Audrey Rasmussen Mackie. (TT at 2026). The Commonwealth's expert forensic accountant  used the Senatorial staff employee's lowest estimate of the portion of their day that was spent on political activities, and the highest estimate of the hours the employee worked each day.

Jamie Pavlot testified that 2½ hours of each day was devoted to political work and she worked a 10 hour day. Since a Senatorial staff employee's work-day is 7½ hours, and she worked an extra 2½ hours of each day, none of her required work hours were spent on political work. (TT at 2029, 2040). However, this was not the case for the other

Senatorial staff employees.

Senate employee Barbara Brown's testimony demonstrated that a minimum of 1½ hours of her work-day was spent on political work that was paid for by the government, for a total of $4,809.00. (TT at 602,631,2032-2033). Senate employee Jason Davidek worked a regular 7½ hour day and at least 30% of his day was devoted to political work, for a total amount of political work paid by the government of $1,032.71 when he was an intern and $2,632.15 when he was an employee. (TT at 767, 3037). Senate employee Joshua Dott worked a regular 7½ hour day 3 days a week as an intern and 5 days a week as an employee and at least 25% of his day was devoted to political work, for a total amount of political work paid by the government of $571.32 when he was an intern and $747.25 when he was an employee. (TT at 975,3038). Senate employee Audrey Rasmussen Mackie worked a regular 7½ hour day and 25% of her day was devoted to political work from January 2009 to April 2009, for a total amount of political work paid by the government of $1,055.32. (TT at 781-782,827, 2041). The total amount of political work performed by the Senatorial staff of Jane Clare and paid by the government was $8,473.90 in 2003, and $2,373.88 in 2009. (TT at 2048).

As specified above, there was sufficient evidence to support the conviction at Count 3 for theft of services. The evidence proved that the defendant had control over the disposition of the services of Barbara Brown, Jason Davidek, Joshua Dott and Audrey Rasmussen Mackie, which in 2003 and 2009 she used to facilitate and promote her political campaign, to which she was not entitled, and knowingly diverted such services to her own benefit and the value of the services was greater than $2,000.00.

At Count 4, the defendant was charged and convicted of Criminal Conspiracy in that the defendant, with the intent of promoting or facilitating the crime of theft of services, diversion of services, conspired and agreed with Janine Orie and/or Jane Clare Orie that they or one or more of them would engage in conduct constituting such crimes or an attempt or solicitation to commit such crimes and in furtherance thereof committed one or more of the following overt acts: directed staffers from both Judge Orie Melvin's Superior Court staff as well as staff members of Senator

Jane Clare Orie's legislative office, to facilitate and promote the defendant's election campaigns for higher judicial office in both 2003 and 2009, in violation of 18 Pa. C.S.§ 903(a)(1). The evidence as described above overwhelming proved the conviction at Count 4.

At Count 5, the defendant was charged and convicted of Misapplication of Entrusted Property of Government or Financial Institutions, in that the defendant applied or disposed of property valued at more than $50.00, namely personally and through Janine Orie, an accomplice pursuant to 18 Pa.C.S. §306, used her Superior Court office facilities and office equipment to facilitate and promote the defendant's political campaign activities in her bid for higher judicial office in both 2003 and 2009, that had been entrusted to the defendant as a fiduciary, or property of the government or of a financial institution, in a manner which said defendant knew was unlawful and involved substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted, in violation of Sections 4113(a) and (b) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa.C.S. §4113 (a) & (b).

The evidence proved the defendant used the Superior Court's office and equipment for her political campaign. Lisa Sasinoski testified that sometimes she would have to wait at the Superior Court office's only printer while it was being used by Janine Orie for political campaign material. (TT at 1122). Excel spreadsheets tracking campaign contributions existed on the Superior Court's computers for all of the defendant's staff to access. (IT at 1114). Kathy Squires testified that Janine Orie used the computers, printer, photocopier and fax machine for campaign work. (TT at 1610).

As specified above, there was sufficient evidence to support the conviction at Count 5. The defendant used Superior Court office facilities and equipment, valued at more than $50.00, personally and through Janine Orie, to facilitate and promote her political campaign thereby committing the criminal offense of misapplication of entrusted government property.

At Count 7, the defendant is charged and convicted of Criminal Conspiracy, in that the defendant, with the intent of

promoting or facilitating the crime(s) of Tampering with Physical Evidence, conspired and agreed with Jane Clare Orie that they, or one or more of them, would engage in conduct constituting such crime(s) or an attempt or solicitation to commit such crime(s), and in furtherance thereof committed one or more of the following overt acts: believing that an official investigation was pending or about to be initiated, encouraged or requested Jamle Pavlot to engage in conduct that would constitute the crime of Tampering with Physical Evidence, or that would establish the defendant's complicity in said crime, when on or about early November, 2009, the defendant, while on a telephone can with Senator Jane Orie and Senator Jane Orie's Chief of Staff, Jamie Pavlot, told Jamie Pavlot to remove any political documents from two boxes of materials which Jamie Pavlot had removed from Senator Jane Orie's senatorial district office, in violation 18 Pa.C.S. §903(a)(1).

Jamie Pavlot testified that the following telephone conversation occurred:

> …[Jamie Pavlot] received a phone call from Jane Orie and she said Jamie, this is Jane, I have Joan on the phone. Joan said, hi, Jamie. I said hi, Judge. And they said to me, both of them had identified themselves and said to me, Jamie, what's in those boxes. And I said, well, there are a number of things in the boxes. What are in the files? I said it appears to be some expense reports, it appears to be some contributors lists, looks like some political literature is in there, some other miscellaneous things are in there.
>
> And Jane said, Jamie anything that's political of mine, I want you to pull those files out of those boxes. And the Judge said, Jamie, anything political of mine, I want you to also pull them out of those boxes. And I said, okay. But I didn't do it.
>
> (TT 333-334)

The testimony of Jamie Pavlot was sufficient to support the conviction of Count 7, conspiracy to commit tampering. The evidence was sufficient to support convictions for theft of services, conspiracy to commit theft of services, misapplication of government property and conspiracy to commit tampering.

Commonwealth Exhibit 73 at 17-26 (APP 2137-2146).

     3.     In the instant Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C.

§2254, petitioner has raised the following claims:

> 1.     The charges against Orie Melvin violate due process because they are premised on alleged violation of an internal court rule.

> 2.     The prosecutor failed to search for exculpatory evidence in violation of Brady and Orie Melvin was denied access to evidence in violation of the Fifth and Sixth Amendments.

> 3.     Orie Melvin was denied any opportunity to challenge the prosecutor's direct and indirect use of her personal emails which were seized pursuant to an unconstitutional warrant.

> 4.     Orie Melvin was denied a fair trial as a result of the prosecutor's knowing introduction of false evidence.

> 5.     The requirement that Orie Melvin write letters of apology violates the Fifth Amendment.

     4.     Initially, it must be determined whether the instant petition is timely filed.

The instant petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act (AEDPA). The act provides:

> § 2244 Finality of determination

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-

> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> > (B) the date on which the impediment to filing an application created by State action in violation of the

Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection.

28 U.S.C.A. §2244(d).

The instant petition is timely.

5.    Under AEDPA, the standard of review has been set forth by the Supreme

Court of the United States as follows:

Under §2254(d)(1), the writ may issue only if one of the following is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to… clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of… clearly established Federal law as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523 (2000); 28 U.S.C.A §2254(d)(1);

*see also Werts v. Vaughn*, 228 F.3d 178, 196 (3rd Cir. 2000); *Matteo v. Superintendent SCI Albion,* 171 F.3d 877, 880 (3rd Cir. 1999). Any change in the applicable law by the United States Supreme Court would constitute new law and could not be applied for the first time in a federal habeas proceeding.   *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060 (1989).

Under 28 U.S.C.A. §2254(d)(1), the Supreme Court of the United States has defined a decision that is "clearly contrary" as follows:

> we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). See also *Early v. Packer*, 537 U.S. 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*per curium*).

*Price v. Vincent*, 538 U.S. 634, 123 S.Ct. 1848, 1853 (2003). In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgement the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-699, 702, 122 S.Ct. 1843, 1852 (2002).

6.      The initial consideration in any federal habeas corpus action involving a state prisoner should be to ascertain whether petitioner has satisfied the exhaustion requirements of 28 U.S.C.A. §§2254(b) and (c).

28 U.S.C.A. §2254(b)(1) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that-

> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B) (i)  there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C.A. §2254(c) provides:

> An applicant shall not be deemed to have exhausted the remedies available in the courts if he has the right under the law of the state to raise, by any available procedure, the question presented.

The well-settled principle based upon comity which rules this area is that the state should be afforded the initial opportunity to correct any errors which may have been committed in its courts.  Therefore, for a state prisoner's allegations to be cognizable in a federal habeas proceeding, the issues presented must have been first presented to the state's highest court for consideration.  28 U.S.C.A. 2254(b)(1)(A); *Preiser v. Rodriguez,* 411 U.S. 475, 491, 93 S.Ct. 1827, 1837 (1978).

This, however, does not mean that a prisoner can simply disregard the state procedural rules of preserving the issues in the trial court, intermediate appellate courts and the state's highest court.  Indeed, an issue which has not been properly raised in the state courts or one which can be deemed to have been barred by procedural default in the state courts is an issue that has not been exhausted with respect to state remedies.  *See Castilles v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056 (1989) (it was error to rule that Peoples exhausted his state remedies by raising issues in a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania when those issues were never raised to any other Pennsylvania Court).

Moreover, "[b]oth the legal theory and the facts supporting a federal claim must

have been submitted to the state court" for a claim to be deemed exhausted. *Bond v. Fulcomer,* 864 F.2d 306, 309 (3rd Cir. 1989) (citing cases). Indeed, the United States Supreme Court has explained:

> If state courts are to be given the opportunity to correct alleged violations of prisoner's federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

*Duncan v. Henry*, 513 U.S.364, 366, 115 S.Ct. 887, 888 (1995).

However, federal courts have recognized that the exhaustion requirements can be overlooked or excused if the state has no remedy or an ineffectual one. *Castilles v. Peoples*, *supra*. As a general matter, the federal courts have recognized that Pennsylvania has an available remedy in the form of the Post-Conviction Relief Act. Indeed, the Court of Appeals for the Third Circuit has recognized that "Pennsylvania has a preference for post conviction attacks being initially litigated in its courts rather than the United States district courts." *Peoples v. Fulcomer*, 882 F.2d 828, 832 (3rd Cir. 1989) *quoting Ross v. Petsock*, 868 F.2d 639, 642 (3rd Cir. 1989). *See Carter v. Vaughn*, 62 F.3d 591, 594 (3rd Cir. 1995) quoting *Story v. Kindt*, 26 F.3d. 402, 405 (3rd Cir. 1994) ("[F]ederal courts may entertain the merits of a petition for habeas corpus where state remedies have not been exhausted 'when no appropriate remedy exists at the state level or when the state process would frustrate the use of an available remedy.'"). A claim has not been exhausted as long as a petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C.A. §2254(c).

A federal court is required to dismiss a state prisoner's petition containing both exhausted and unexhausted claims. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198 (1982). *See also Schandelmeier v. Cunningham*, 819 F.2d 52 (3rd Cir. 1986). In such a case, petitioner could option to delete all unexhausted claims and allow the federal courts to address only the remaining claims. *Rose v. Lundy*, *supra*.

The Commonwealth respectfully submits that petitioner has presented one unexhausted claim. In petitioner's fourth claim, she claims that she was denied a fair trial as a result of the prosecutor's knowing introduction of false evidence. Petitioner did not raise this claim as a federal claim in state court. Petitioner only raised state law and state constitutional violations. Consequently, the claim is unexhausted.

The lack of exhaustion should not be excused especially in light of the option open to the petitioner to raise this in the state courts by filing a petition under the Post-Conviction Relief Act (PCRA). *See* 42 Pa.C.S.A. §9541 et. seq. However, any petition raising this or any claim filed now would be beyond the jurisdictional time limitation. Because a petition containing this claim would now be time-barred under the state Post Conviction Relief Act, 42 Pa.C.S.A. §9545(b), exhaustion could be excused. 28 U.S.C.A. §2254(b)(2). Consequently, because petitioner would have no avenue for relief in the state courts, exhaustion may be overlooked. *Lines v. Larkins*, 208 F.3d 153 (3rd Cir. 2000). A petition that contains both exhausted and unexhausted claims, but procedurally barred claims is not a mixed petition that requires dismissal. *Wenger v. Frank*, 266 F.3d 218 (3rd Cir. 2001).

Accordingly, because the unexhausted claim cannot be presented to the state courts, exhaustion could be excused. *Carter v. Vaughn, supra*.

As to the remaining claims, they are exhausted. *See Lambert v. Blackwell*, 387 F.3d 210, 233 (3rd Cir. 2010) ("Order No. 218 renders review from the Pennsylvania Supreme Court "unavailable" for purposes of exhausting state court remedies under § 2254(c))").

7.     However, if a claim can no longer be presented in the state court and exhaustion could be excused, before the claim can be reviewed by the federal courts, a petitioner must also demonstrate that the claim has not been procedurally defaulted.

In *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546 (1991), the United States Supreme Court clarified the standard for procedural default and explicitly held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 751, 111 S.Ct. at 2565. Procedural default can only be excused if there is cause and prejudice.  *Id.*  The petitioner bears the burden of establishing the cause and prejudice necessary to overcome procedural default and the cause must be "something *external* to the petitioner that cannot fairly be attributed to him."  *Id.* at 753, 111 S.Ct. at 2566.

If petitioner fails to meet the "cause and prejudice" standard, it must implicate a fundamental miscarriage of justice in order to obtain review. *Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 861 (1995). This exception is extremely narrow. In order to establish a miscarriage of justice, petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*

*v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649-2650 (1986).   In order to demonstrate actual innocence, petitioner must demonstrate that "it is more likely than not that a reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. at 327, 115 S.Ct. at 867.

Petitioner's fourth claim is not reviewable in state court, because of a state procedural default under the Post Conviction Relief Act. If the petition would now be filed, it would be untimely. Petitioner has alleged no cause for his failure to characterize, in state court, her claim as a violation of federal due process. Accordingly, petitioner is not entitled to habeas relief.

8.      Finally, if it is determined that a petitioner's unexhausted claims are without merit, the application for a writ of habeas corpus may be denied notwithstanding the failure to exhaust.   28 U.S.C.A. §2254(b)(2).   The Commonwealth submits petitioner's claims are meritless and his petition should be denied on this basis as well.

**1.      The charges against Orie Melvin violate due process because they are premised on alleged violation of an internal court rule.**

First, petitioner claims that she was prosecuted for transgressing work related rules. Petitioner claims that she was wrongly prosecuted for conducting political activity during the course of her and her employees employment. Petitioner contends that when the Supreme Court of Pennsylvania promulgated rules prohibiting political activity, there was no notice that a criminal offense was being committed in violation of her due process rights.   The Commonwealth submits that petitioner was in fact guilty of using public resources to further her own personal career goals, including the becoming a justice on the Supreme Court of Pennsylvania.

**a.      A prosecution premised on a violation of court rules and policies**

**violates due process.**

A federal habeas review of a due process claim is not a mere review for "error" but rather the narrow review of infractions that violate fundamental fairness.  *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 674 (1990); *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868 (1974)

In denying this claim the Honorable Lester G. Nauhaus held:

> The defendant was not prosecuted because she used her office/staff and the office/staff of Senator Orie for political activity; she was prosecuted because she used state resources for personal activities that were not state related. She encouraged her office/staff and the office/staff of Senator Jane Orie to engage in activities other than those that fall within the domain of the office responsibilities. This Court continued to use the analogy of using her office/staff and the office/staff of Senator Jane Orie to wash her cars, which would also be a criminal offense.

> The defendant is charged with violation 18 Pa.C.S.A. §3926(b), which states:

>> (b) Diversion of services.—A person is guilty of theft if, having control over the disposition of services of others to which he is not entitled, he knowingly diverts such services to his own benefit or to the benefit of another not entitled thereto.

> The criminal charges of theft of services, and conspiracy to commit theft of services were not premised on alleged violations of the internal court rule.  The criminal charges stem from the defendant having control over the services and equipment of her Superior Court Judicial staff and the Senatorial staff of Jane Clare Orie and diverting those services and equipment for her own benefit.  The defendant was not prosecuted because she engaged in political activity in 2003 and 2009, she was prosecuted because while she engaged in political activity she diverted state resources for her own benefit.

> The theft of services statute has not criminalized political activity performed by a judicial staff employee during

42

personal time when the employee is not being paid with state funds.  While such political activity would violate the Order of the Supreme Court prohibiting political activity by judicial employees, such political activity could not be subject to criminal prosecution.

However, in the instant matter, the charges allege that political activity was performed by the Superior Court Judicial staff and the Senatorial staff of Jane Clare Orie during working hours, thus diverting state resources for defendant's personal benefit.  Commonwealth resources were being misappropriated for personal benefit.

\*          \*          \*          \*

The defendant alleges that the theft of services, conspiracy to commit theft of services and misapplication of government property convictions should be vacated because those charges constitute an unconstitutional infringement of the exclusive power to supervise the courts conferred upon the judiciary by, inter alia, Article 5, Section 10 of the Pennsylvania Constitution.

As explained herein, the charges of theft of services, conspiracy to commit theft of services and misapplication of government property were not premised on alleged violations of an internal court rule.  The prosecution was for diverting state resources for defendant's personal benefit to which she was not entitled.

Commonwealth Exhibit 73 at 6-8. (APP 2126-2128). The trial court did not err in this regard.

At CC 201209885, petitioner was charged as follows:

**Count 1  THEFT OF SERVICES**: The actor having control over the disposition of services of others, namely actor's Superior Court Judicial staff, which she, personally and through Janine Orie and Jane Claire Orie, accomplices pursuant to 18 Pa.C.S. §306, utilized to facilitate and promote the actor's political campaigns for higher judicial office during election cycles in both 2003 and 2009, to which she was not entitled, knowingly diverted such services to her own benefit ….

**Count 2  THEFT OF SERVICES**: The actor having control over the disposition of services of others, namely a  member

of her judicial staff, Janine Orie, which she utilized to facilitate and promote the actor's election campaign for higher judicial officer during election cycles in both 2003 and 2009, to which she was not entitled, knowingly diverted such services to her own benefit ….

**Count 4   CONSPIRACY**:   The actor, with the intent of promoting or facilitating the crime(s) of Theft of Services, Diversion of Services conspired and agreed with Janine Orie and/or Jane Clare Orie that they or one or more of them would engage in conduct constituting such crime(s) or an attempt or solicitation to commit such crime(s), and in furtherance thereof committed one or more of the following overt acts: directed staffers from both Judge Orie Melvin's Superior Court staff as well as staff members of Senator Jane Clare Orie's legislative office, to facilitate and promote the actor's election campaigns for higher judicial office in both 2003 and 2009….

**Count 5  MISAPPLICATION OF ENTRUSTED PROPERTY AND PROPERTY OF GOVERNMENT OR FINANCIAL INSTITUTION**:   The actor applied or disposed of property valued at more than $50.00, namely personally and through Janine Ore, an accomplice pursuant to 18 Pa.C.S. §306, used her Superior Court office facilities and office equipment to facilitate and promote the actor's political campaign activities in her bid for higher judicial office in both 2003 and 2009, that had been entrusted to the actor as a fiduciary, or property of the government or of a financial institution, in a manner which said actor knew was unlawful and involved substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted….

*See* Commonwealth Exhibit 2 (APP 25-31). In support of these charges the Commonwealth introduced a vast body of evidence which showed that petitioner, in 2003 and 2009, used both her judicial staff and the legislative staff of then-Senator Jane Clare Orie, to run, promote, and facilitate her campaign efforts to win a seat on the Supreme Court of Pennsylvania.   The evidence establishing petitioner's guilt demonstrate that she was not prosecuted for violating any provision of the Judicial Code

of Conduct or Court Order/Rule prohibiting political activity among court employees.

Lisa Sasinoski, Esquire was the Chief Law Clerk for petitioner in 2003.  It was petitioner's policy that Ms. Sasinoski and all other judicial employees in the office took directives from both Janine Orie, who was one of petitioner's secretaries (as well as her sister and co-defendant/co-conspirator herein), and then-Senator Jane Orie (also petitioner's sister and co-conspirator). While being paid by the Superior Court of Pennsylvania to do court related work, Attorney Sasinoski, at the direction of either petitioner, Janine Orie, or Jane Orie, would perform political campaign work for petitioner.  Such work included writing letters to state committee members of the Republican party and using Superior Court copiers to print the letters, writing political speeches for petitioner to deliver, updating petitioner's resume, filling out political questionnaires for petitioner to send to organizations seeking political endorsements, travelling with petitioner to out-of-county argument sessions and then going to political "meet and greet" sessions at law firms, preparing expense reports for petitioner's campaign, assisting in preparing spreadsheets to keep track of fund raising checks for the campaign, and preparation of "thank you" letters to donors. (TT 1071-1194).

Attorney Sasinoski further detailed how the aforementioned activities adversely affected the resources, equipment, and facilities of the Superior Court:

> [Direct examination by Assistant District Attorney Lawrence
> N. Claus:]
>
> Q       Were you engaged in doing any non-judicial work in
> that office?
>
> A       Yes, I was.
>
> Q       How would you characterize to this jury the nature of
> that non-judicial work?

A      It was political.

Q      What do you mean political, and for whom?

A      I found out a little bit before the beginning of the year that the Judge was running again, and she wanted this time to get started in January and go to all the caucuses, so as I recall, we wrote a letter a few weeks  before that to all of the Republican State Committee people, and it was printed at the office, and I drove it out to her house, and she signed each of the 430 some letters while I folded them, stuffed them, and then took them to mail them.

Q      This 400 something letters, where were they printed?

A      At our office.

Q      And when you say our office?

A      At the chambers on Grant Street in the Grant Building.

Q      At whose directive did you do that, ma'am?

A      Well, the Judge needed it done, and it was her direction that we would make a contact with the State Committee people to start that phase of the campaign.

(TT 1078-1079);

Q      Well, let's talk for a minute about any involvement you might have had with any speeches that she may have given to promote her candidacy.  Did you have such involvement?

A      Yes, I wrote many of those speeches.

Q      How would you get those to her?  Where would they be printed, for example?

A      In the office.  I would come into the office and I would hear that today she needed a speech for the builders.  There is a Builders Association, and they are concerned with zoning issues, they are concerned with code, changes in material, it's going to make it more expensive for them to build, so they wanted to know if there were any cases that

we had on zoning to see how she came down on issues like that. And so we would scramble, pull out some of those and write a speech for that.

Q      What would happen with your normal judicial work that was sitting on your desk to be done?

A      Well, I would try to take that home and do it when I could.

Q      What was the priority?

A      In '03 it was the campaign, because if she didn't win, then there wouldn't be a job.

*          *          *          *

Q      Do you know how a particular candidate, whether Joan Orie Melvin or otherwise, would get an endorsement from any particular special interest group?

A      If it was a more sophisticated group, they would have a questionnaire, and they would send you their questions. You would contact them and say I'm running, or they would find out you were running from reading any of the papers, which those groups are political, and they would then send you a questionnaire, and there would be background.  Those were easy to fill out.  Where you had gone to school, what your background was, children, things like that, and then there would be issues, and they would ask questions of where you stood on issues.

Q      Well, surely this would be done by the political campaign committee or group that was running her campaign, correct?

A      Which was our office, and so I filled out those forms.

(TT 1099-1101);

Q      Let's move on to things that may have been occurring in the office, please.  And by office, I'm talking about chambers, the Superior Court office.

Are you aware if any campaign or fundraising checks ever made their way into the Superior Court chambers of Joan Orie Melvin?

A       Yes, I saw them routinely.  That's how they kept track of many of them.  We didn't get all of them, but many of them came through, and it was a way to establish a tracking system to then write thank you notes.

Q       As a practical matter, who dealt with those documents when they came through?  Did you?

A       I helped Kathy Squires start an Excel spreadsheet to keep track of these.  Kathy didn't know how to work Excel, and I did, so I set up the - - it's a program that Microsoft has that you can then sort data.  It's different than word processing.

Q       What was the data content of that to be on the spreadsheet that you set up for Kathy Squires?

A       First name, last name, address, amount of money they contributed, city, state, the address you needed to then keep track of people and use it for the campaign expense report, and to send thank you notes.

Q       So would it be accurate to say that spreadsheet would be retained on a computer?

A       Yes.

Q       In the judicial office?

A       It was retained on the hard drive for a while.  We tried the idea of doing it on a disc.  One of the discs, twice the discs were damaged, causing the secretary to have to retype, and so then we tried, then we threw our hands up and said go back to the hard drive.

Q       And so you just used the court's computer to retain storage of that political material?

A       Yes.  We used the court's.  Everyone had access to it, I could get on, Kathy Squires could get on, Janine could get on, and everybody had the shared drive.

Q       Was there ever an instance that you recall in which it was perceived, whether correct or not, that data had been lost regarding campaign related material?

48

A      Yes, I remember it happening twice.

Q      Would you describe either one or both or those events, please?

A      Well, the first event, and I don't remember which order they were in, but the first one that comes to mind was Kathy Squires came into my office, closed the door and was nearly in tears and said she had been typing for two days and she hit a button and everything was deleted.   Her request to me was can you help me recover all the work that I had done.  And with that, I picked up the phone and I called the computer services in our building.  There was a woman who was assigned to the western part of the state to be our tech person and troubleshoot computer problems, and her name was Linda Ollio.  And I called her

                    *              *              *              *

Q      What happened?

A      She said what document are you looking for.  I said it was within the last ten minutes, it was Kathy Squires' computer.  Can you just put it back on.  We deleted, and just reinstall.  And she said no.

Q      She said no?

A      She said no.

Q      Was there a reason given?

A      Well, when I told her what time it had been done, documents that Kathy Squires had, and the one that had just been opened and deleted was labeled Campaign.  And she said, are you kidding me, this says campaign.  I said to her, please just put it back on, the poor girl has been typing for days.  And she said, I can't be political, I can't allow you to be political, and you can't use court equipment to be political.

(TT 114-1118);

Q      Now, can you testify about any particular activities of a political nature that Janine Orie was involved?

A      Her whole day was working on the campaign.

49

Q      Why would you say that, ma'am?

A      Well, because it would start with she had a list of things she wanted to get done, lists of things she wanted us to get done, and she did a lot of ordering or contacting different vendors.   There was no one else in the office contacting the vendors like she was.

Q      We are talking about vendors for the political campaign?

A      Yes.

Q      Did you ever personally see any copies or printers being used for political matters regarding the Joan Orie Melvin campaign?

A      We only had one printer in the office.  It was the size of a television, a smaller up on a table, and that printer was what everyone had to use.  We were writing opinions, the clerks and I were writing opinions on average about ten pages long, on average about one and-a-half opinions every week.  So I would go to the printer to print something and I would see political materials coming out.  And I would have to stand there for a few minutes and wait.

(TT 1121-1122).

Similar testimony was given by Molly Creenan, who was also one of petitioner's law clerks:

[Direct examination by Assistant District Attorney Lawrence N. Claus:]

Q      Do you know what a political poll card is, ma'am?

A      I believe that was what was put in the bags that we were asked to pass out for the election in 2003.

Q      Did you ever see any of those in either 2003 or at any time during the election campaign actually being produced in the office?

A      I recall in 2009 Janine was actually making the cards

50

in the office with a paper cutter.

Q       So she was actually cutting a larger piece into the individual poll cards?

A       Yes.

Q       This is Janine Orie?

A       Yes.

Q       How about thank you cards?  Do you know what they are in relationship to a political campaign?

A       I recall observing thank you letters to contributors that were being printed out of our printer and Janine was printing them out.  I spoke to her about them, and I said you can't be doing this.  And she said to me, I'm using a laptop.  And that didn't make any sense to me because I didn't see her using a laptop and I saw her using the printer to print out all of these letters.

(TT 1395-1396).

The record is also replete with examples of how legislative resources were used in a private capacity to facilitate and run petitioner's political campaigns.  In 2003, Barbara Brown, an Executive Assistant to then-Senator Orie, working out of the Senator's Harrisburg Office, and while being paid by the Senate to perform state related work, would be directed by Jane and/or Janine Orie or petitioner to take petitioner to "meet and greets" with Law Firms and private businesses and other campaign related events.  Ms. Brown also compiled campaign finance reports on Justice Max Baer, who ran against petitioner in 2003, at petitioner's request. (TT 599-660).   Ms. Brown estimated that 40% to 50% of her work day in 2003, while employed for the Senate, was spent working on petitioner's campaign. (TT 630-631).

Ms. Brown's supervisor, Ginger Hope, testified that she was well aware that Ms.

Brown was assigned to do campaign work for petitioner.  Ms Brown would be given

comp time for time spent after hours working for petitioner's campaign (RR 3688a-

3724a).  The Senator had relegated her staff to be petitioner's campaign employees:

> [Direct examination by Deputy District Attorney Lawrence N. Claus:]
>
> Q     Did you ever have any specific instructions from the Senator in regard to any directives from either Joan Orie Melvin or Janine?
>
> A     The only thing the Senator always made clear is if I tell you to do something, or my sisters, they say something, it is just like saying it from me.  Meaning, if Joan or Janine would say I need this, it's like the Senator saying it.  They are all in one.  They were all the same.

(TT 685-686).

Senator Orie's Pittsburgh Office in 2003 and 2009 was also used to advance

petitioner's campaign, while using state resources. Jamie Pavlot, Senator Orie's Chief

of Staff, testified as follows regarding her actions in furthering petitioner's campaign:

> [Direct examination by Deputy District Attorney Lawrence N. Claus:]
>
> Q     If an invitation to a political function, a fundraiser, went off and somebody had to send back an invitation, for any of those, to your knowledge, Joan Orie Melvin's campaign come through that Post Office in Ingomar?
>
> A     Yes.  There was an October fundraiser for the Judge that the donations and RSVP cards and contributions came to that P.O. Box.
>
> Q     Was that the October 14 event here in Pittsburgh?
>
> A     Yes.
>
> Q     How do you know that the checks and/or information

may be confirmation that they were coming or regrets they can't come?  How do you know they were coming through that mailbox?

A      Because our staff, the Senator's legislative staff, some individuals would have to go over to that P.O. Box on a regular routine basis, pick up, get the mail, bring it back, and then I would have to sort through it, open it up and see what checks there were in it.  And then we would have to put that into a database, contribution fundraising database and we would have to list it.

Q      Could we stop at that point for a moment.  You are saying you would actually open the envelopes, even though it says for Joan Orie Melvin's campaign?

A      Yes.

Q      You would take out the check?

A      Yes.

Q      Did you do anything with the check, and if so, what was done with the check?

A      Xerox the check.

Q      Who actually did that in the 2009 time period, if you know?
A      We had assigned Josh Dott to take the information, lift the information off the check and database it into a spread sheet, a contributions spread sheet.

Q      Where was this computer work being done?

A      At the legislative office.

Q      So this material, the information, the checks goes into a spread sheet?

A      Yes.

Q      You said a copy was made upon what, how was the copies made?

A      At our legislative Xerox machine.

Q      How were the original checks handled, if you know?
In other words, the actual negotiable part of the mail, where
did the checks go?  Did you cash the checks?

A      Oh, where did they go?  We had to put them in an
envelope and take them over to the Orie house.

(TT 235-237).

As the foregoing demonstrates, petitioner's assertion that the prosecution was constitutionally invalid because of a separation of power issue lacks merit, as it is built on a faulty premise.  Petitioner was not prosecuted for pure political activity.  Nor was she prosecuted for violating a Supreme Court Order regulating activity of judicial employees.   Further, the Commonwealth is not attempting to criminalize voluntary political activity by judicial or legislative staff on personal, private time while not being paid with state funds. Had the employees been acting on their own time, the situation would have been one for the Supreme Court to handle.  The fact is however, the activity was being performed when the employees were being paid to do the Commonwealth's business; and was being carried out with equipment and supplies given to petitioner to perform her duties as a judge, or to Jane Orie, to perform her  duties as a Senator.  The mantle of political activity is whole cloth in this regard as a judicial robe is not authority to stick one's hand into the public coffer for private gain.  At the hearing before Judge Nauhaus petitioner outlined the breadth of her position:  "She can't be prosecuted for alleged criminal activity that relates to supervision of her staff or the use of court resources, and that stems right from the constitution."   (HT, 12/21/12,16).  It is petitioner's position that anytime the Supreme Court establishes guidelines for conduct, those  guidelines  insulate  the  individuals  governed  thereby  from  any  prosecution

tangential to the regulated conduct:

> **JUDGE NAUHAUS**:  Let me ask you this question on that particular situation.  Let us assume that, well, not any lawyers in here but some lawyer has a personal injury case, settles that case, has a 40 percent contingent fee basis but keeps all of it.  Keeps all of it.
>
> There's no question that that is something that the D Board can go after him or her for.  Are you telling me that the district attorney can't prosecute this guy?
>
> **MS. WALSH**:  What I haven't heard in your example, Your Honor, is a rule.
>
> **JUDGE NAUHAUS**:  He stole money.
>
> **MS. WALSH**:  That's right.  But there's no rule at issue.  There's no court rule at issue.   There's no court rule at issue in that case.  There's no - -
>
> **JUDGE NAUHAUS**:  All right.  Let us assume there is a court rule and the rule says that if you collect money from your client, you have to give it to that client.
>
> **MS WALSH**:  I believe, Judge, under the constitution, if there is a court rule and that is within the exclusive authority of the Supreme Court to regulate, then it is something that the executive - -
>
> **JUDGE NAUHAUS**:   So that person can escape incarceration under those circumstances?
>
> **MS. WALSH**:  If there's a court rule it's within the scope of the authority given to the Supreme Court.
>
> **JUDGE NAUHAUS**:  Okay.
>
> **MS. WALSH**:   But, Your Honor, thankfully that's not our situation.
>
> **JUDGE NAUHAUS**:  Yes, it is your situation.  That's what I'm trying to get my mind around.  I mean, we're talking about alleged criminal behavior here.
>
> **MS. WALSH**:  And, Your Honor, the criminal behavior - -

> **JUDGE NAUHAUS**:   And you're telling me that the government or the authority, the executive branch can't do anything about criminal behavior?
>
> **MS. WALSH**:  They can't try to criminalize a Supreme Court - -
>
> **JUDGE NAUHAUS**:  They're not trying to criminalize it.  It's a crime.  Theft is a crime.

(HT, 12/21/12, 21-23).

The ramifications of petitioner's argument are frightening to a free society. Supreme Court Justices and Judges of inferior courts are given a get-out-of-jail-free card in a situation where the average citizen would face criminal charges.  For instance, assume the Supreme Court enacts a Rule directing that justices and judges shall not engage in sexual harassment of court employees.   Assume that a judge sexually assaults his or her law clerk.   Under petitioner's theory, that judge could not be prosecuted for the sexual assault because the conduct was subsumed and covered by the Court Rule on sexual harassment.  This result would be absurd, but it is the logical result of petitioner's argument.

The Rules of Procedure for the Judicial Conduct Board recognize that improper activity engaged in by a judge can be both a violation of the Rules of Professional Conduct for Jurists as well as a criminal violation.   Under Rule 3 "[t]he Board shall receive and investigate complaints concerning judicial conduct…."  Once all information is gathered, Rule 18 (C) and (D) provides that "information related to violations of criminal laws may be disclosed to the appropriate governmental agency[;]" and that "information related to violations of rules of professional conduct may be disclosed to

the appropriate agency." The Supreme Court of Pennsylvania thus recognized that its own Board would, on occasion, be confronted with activity by judges that crossed the line into criminal behavior and would need to convey that information to the proper law enforcement agency for prosecution.

Indeed, holding judges responsible for criminal behavior is a foundational principle of the Pennsylvania Constitution. Pennsylvania Constitution Article V establishes a Board to review complaints against judicial officers and clearly notes in subsection (n) that it is not the only mechanism for such investigation and review:

> (n) This section is in addition to and not in substitution for the provisions for impeachment for misbehavior in office contained in Article VI. No justice, judge or justice of the peace against whom impeachment proceedings are pending in the Senate shall exercise any of the duties of office until he has been acquitted.

Pennsylvania Constitution Article VI §6 **Officers liable to impeachment**, of the Constitution (referenced in Article V above) then makes firm the fact that even a jurist who is not impeached, can be prosecuted for the very conduct that caused the impeachment proceedings to be initiated: "The person accused, whether convicted or acquitted, shall nevertheless be liable to indictment, trial, judgment and punishment according to law."

Petitioner's case is about the misuse of government resources by an elected member of the judiciary; it is not about a judge exercising her First Amendment right to speak about a certain topic, or to hold a political job outside the judiciary.

On appeal, the Superior Court addressed the claim as follows:

> Orie Melvin argues that *Stern, Dobson,* and *Kremer* compel the conclusion that in her case "the District Attorney is seeking to criminalize conduct that is already the subject

of regulation by the Supreme Court." Orie Melvin's Brief at 22. We disagree. In those three cases, the Supreme Court had adopted rules regulating the specific conduct of attorneys and judges, thus establishing in each instance the Supreme Court's intention to exercise its authority to regulate the conduct at issue. More importantly, in each of those cases, the Legislature attempted to regulate precisely the same conduct covered by the Supreme Court rules. That symmetry does not exist in this case. While the Supreme Court has adopted a rule prohibiting political activity by court employees, Orie Melvin was not criminally prosecuted for using her judicial staff to advance her political aspirations.[4] None of the crimes for which she was prosecuted or convicted specifically proscribes political activity.[5] Instead she was prosecuted for the use, or rather the misuse, of her judicial staff in violation of criminal statutes prohibiting the diversion of services belonging to the Commonwealth to her own personal benefit. The political nature of the conduct did not serve as the basis of the criminal conviction. Any conduct by her judicial staff that inured to Orie Melvin's personal benefit constituted a diversion of services from the Commonwealth, whether or not said conduct violated the 1998 Supreme Court Order against political activity. In sum, Orie Melvin's convictions were based on her theft of services by using her judicial staff and her sister's senatorial staff, all of whom were paid with taxpayer dollars to advance her campaign for a seat on the Pennsylvania Supreme Court.

*Commonwealth v. Orie Melvin*, 103 A.3d at 15-16.

When deciding this claim under AEDPA, the federal courts must apply the presumption of correctness regarding factual and legal conclusions reached by the state courts as contained in 28 U.S.C.A. §2254 (d) and (e).

The state court's decision was not clearly contrary to federal law as determined by the Supreme Court of the United States. Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state

court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. at 698-699, 122 S.Ct. at 1852. Thus, petitioner would not be entitled to habeas relief. 28 U.S.C.A. §2254(d)(1); *Williams v. Taylor*, *supra.*.

      **b.**    **The sufficiency of the evidence**.

The Commonwealth submits that overwhelming evidence was presented in support of petitioner's guilt for the crimes charged.

The United States Supreme Court has held that:

> the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply determine whether the jury was properly instructed, but to determine whether the record of evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby v. INS*, 385 U.S., at 282, 87 S.Ct., at 486 (emphasis added). Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2788-2799 (1979). In habeas corpus proceedings, federal courts must examine what evidence the state considers sufficient, under state law, to meet the elements of the offense. *Jackson v. Byrd*, 105 F.3d 145, 149 (3rd Cir. 1997).

Appellant forced said employees to do her private political work while the employees were on "the Commonwealth's clock" and being paid to do the Commonwealth's business.

18 Pa.C.S. §3926 (b) provides:

> **(b) Diversion of services.—**A person is guilty of theft if, having control over the disposition of services of others to which he is not entitled, he knowingly diverts such services to his own benefit or to the benefit of another not entitled thereto.

18 Pa.C.S. §4113 (a) provides:

> **(a) Offense defined.—**A person commits an offense if he applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted.

Petitioner does not contend that she did not realize that the relevant theft statutes were unclear in their language.  Indeed, such an argument would run counter to the notice provided by the Superior Court of Pennsylvania in its decision in *Commonwealth v. Matty,* 619 A.2d 1383 (Pa. Super. 1993) (warden of prison guilty of theft for having a prison employee install a ceiling fan in a private residence while the employee was being paid to work in the prison).  The Supreme Court of Pennsylvania's Order at No. 201 Judicial Administration Docket No. 1, issued November 24, 1998, which prohibited "political activity by court-appointed employees" as well as the individual personnel notices that judicial employee had to sign warning them that they were not permitted to "engage in political activity" did not serve to create ambiguity in petitioner's mind. Petitioner was a Superior Court Judge and knew the foregoing case law from this Court. Further, her employees knew the illegality of their conduct and even warned her on occasion:

> [Direct examination of Lisa Sasinoski by ADA Lawrence N. Claus:]
>
> Q      I'm going to ask you to reflect upon the election time

period.  That would be November and its aftermath.  Was there any contact between you and anybody in the judicial office regarding invoices or preparing duplicate invoices?

A      Yes.  I had started to mention that when you gave me this calendar.  Across the bottom of the calendar it says October 30.  That coincides with this calendar being printed on a day that Janine walked into my office and asked me to go through the calendar, and I did for January and February because you see my notes.  But she said go through the calendar and determine when you were places so that we can duplicate those expenses, say that Jane had traveled with her when indeed she hadn't.

Q      With who, please?

A      Jane had traveled with the campaign, with Joan and myself by making a list, reimbursing Jane for what my expenses had been so that she could get cash out of the campaign.

Q      What would be the use of cash coming out of the campaign at that time?

A      Well, first off, it's illegal.  But secondly, you could use the cash then without having to report what you were doing with the cash.

Q      And is there a particular term that's associated with the cash that gets spread around by people in politics at or about that time?

A      Yes, it's called street money.

Q      And street money is used to do what?

A      You can then give it to people in certain neighborhoods that would drive voters to the polls, and give them five bucks for voting.

Q      The campaign ultimately would be the entity that would pay, is that correct?

A      Well, because the sisters were so close, Joan could completely trust if we wrote a check to Jane, Jane would cash it and give it back, but you have to have someone you

really trust to do that sort of thing.

Q      But the bottom line is the actual money, the dollars that would have come out, would have been from the Joan Orie Melvin political campaign?

A      Yes.  Otherwise you have to have - - for expenses, my understanding is you have to account for every money that comes in, and every money that goes out.

Q      And you were concerned of what you were being asked to do was violating the law in what way?

A      It was a violation of campaign expense reports at least, at the least, and at the best, it was forgery.

Q      The bottom line is, did you respond to the request by Janine - - and you are saying Janine asked you to do that?

A      Yes.

Q      And did you actually meet with her in person about that?

A      She stood over me while I did the first two pages where I made notations, because I was like, how am I going to do this?  How will I know?  She said, well, here, we did the caucuses, there was a luncheon, there were these different things.  And when it came to February, I looked over at the clock and I said, you know, I have to meet my husband for lunch, can we do this after lunch?

And I walked out of there almost shaking, went right over to my husband, told him what was going on.  He said, are you crazy, that you would agree to do something like this.  He said, if it doesn't mean enough to you that you have a law license, if it doesn't mean enough to you that you have a career, I wonder what the kids are going to think when they see your picture in the paper in handcuffs.

Q      In this particular instance, that money, had it been invoiced and then debited from the Joan Orie Melvin accounts, would have been used for what purpose?

A      It would have been used for street money.

Q      To enhance the campaign?

A      Yes, that's what she wanted it for she said.

Q      Were there any noticeable repercussions upon you once that occurred, your conversation with Janine and the fact that you really didn't do what she wanted?

A      Yes.

Q      What happened?

A      It got real quiet around the office, and it wasn't four or five days later that there was the election.  And then after the election, I didn't see her - -

Q      Meaning who?

A      The Judge didn't come in the rest of November.  And I understand being upset that you didn't win, but I didn't see her again until the second week of December.

Q      When you did see her, was there any discussion, conversation, or what occurred?

A      I went into her office, and I saw she came in, took her coat off, settled in, I waited, took a breath, went in, and I said, this has got to stop.

Q      When you say this?

A      This has got to stop, this campaigning has got to stop.

Q      You said that to who?

A      Joan Orie Melvin, with Janine standing in the room.

Q      And this was before or after the election?

A      This was December the 8th.

Q      December 8th?

A      December 8th, midday, December the 8th.

Q      Was there a response?

A       She said - -

Q        Meaning?  Which one, please?

A       Joan Melvin looked at me and she said, stop?  We have got to kick it up a notch.

(TT 1134-1138);

[Direct examination of Molly Creenan by ADA Lawrence N. Claus:]

Q       Did you express your concerns to anyone?

A       I expressed them to her directly.

Q       And do you recall how that occurred, where it occurred, and when?

A       I believe it was like December 17 or 18th of 2008.  I had just learned that the Judge was planning on running for the Supreme Court.  I had some concerns about it because of what had occurred in 2003.  I went to Jack Degener the Chief Law Clerk, and Cathy Skidmore, the Deputy Law Clerk and I asked them if they would accompany me to speak with the Judge.  They declined.

Q       Did they say why they declined?

A       No, they just didn't want to go with me.  So I took it upon myself to go speak to the Judge.  I learned that she was coming in that day, and I let Janine know that I needed to speak with her.  I went into the Judge's office, I congratulated her on her decision to run.  However, I told her that I had concerns.  I told her that what happened in 2003 can't happen in 2009.  I said the staff cannot be asked to work a poll on Election Day.  I said the computers and the printers and the copiers cannot be used for any judicial purpose.
I said to her that when Judge Debra Todd ran for the Supreme Court, her secretary at the time took a leave of absence.  I suggested that if the Judge planned on having Janine Orie work on the campaign, that Janine should take a leave of absence too.
I also mentioned to her the Habay case, and the Bonusgate investigations that were going on - -

Q      If I could interrupt.   Is that B-o-n-u-s-g-a-t-e, Bonusgate?

A      Yes.

Q      Habay, H-a-b-a-y?

A      Yes.
                    *              *              *              *
Q      In any event, you expressed some concerns then, correct?

A      I expressed concerns regarding - - I told her about the Habay case and the Bonusgate Investigations.  I said as a result of those matters, our office would be under a lot of scrutiny.  As a result, I told her I would not assist her in completing any questionnaires.  She asked me if I would do them on my own time.  I said no.  I told her if there was ever an investigation into what went on in our office, that I would tell the truth.  And that was the end of the conversation.

Q      At the time you had this conversation and made those statements to then Judge Joan Orie Melvin, did she deny that there was political activity going on in the office?

A      No.

Q      Was there anyone else around that would have been in the position to overhear your conversation with Joan Orie Melvin?

A      I believe Janine was in the office, in and out of the office during my conversation.

Q      You say the conversation then terminated, is that correct?

A      It did.

Q      What happened after that in regard to you and your position in the office?

A      Well, after that conversation, I did relay to Cathy Skidmore and to Jack Degener that I had spoken with the Judge and there shouldn't be political activity in the office.  I

65

also relayed the same message to Kathy Squires, our secretary. After I had that conversation with the Judge, I was not spoken to for a very long time.

Q      By whom please?

A      By neither the Judge nor Janine.

Q      When you say a very long time, how long of a time period is that?

A      It was weeks.

Q      The conversations that you had, did they, to your knowledge, have any change in the way things had been done in '03 in the 2009 campaign?

A      There were some changes. The office staff was not asked to work a poll in 2009, I did not complete any questionnaires in 2009, and I don't believe any of the staff below me, Cathy Skidmore or Bob Woods completed any questionnaires. However, the copiers and the printers and the computers were still used in the office for campaign purposes, mainly by Janine. Janine did not take a leave of absence as I had suggested.

(TT 1134-1138).

Some political work did continue to be done in the judicial chambers with state equipment and personnel during the 2009 campaign, but the base of the campaign operation was shifted to then-Senator Jane Orie's office. Senator Orie did not tolerate employees such as Molly Creenan. Jennifer Knapp Rioja eventually come to work for the Senator and ultimately came forward. Petitioner might have been surprised how she got "caught." There is no way however that she was surprised as to what she was being "caught" for: the criminal law is clear, and she knew it.

In addressing this claim Judge Nauhaus provided this Court with the following discussion:

The evidence supported the three counts of theft of services.  The crime of theft of services occurs when a person who has control over the disposition of services of others to which she is not entitled, knowingly diverts such services to her own benefit or to the benefit of another not entitled thereto. (18 Pa.C.S.A. 3926(b)).

At Count 1, the defendant is charged with having control over the disposition of services of her Superior Court Judicial staff, which during 2003 and 2009, she personally and through accomplices Janine Orie and Jane Clare Orie, utilized to facilitate and promote her political campaign, to which she was not entitled, and knowingly diverted such services for her own benefit and the value of the services was greater than $2,000.00.

The defendant had control over the disposition of services of judicial staff employee Lisa Sasinoski, and was not entitled to use Ms. Sasinoski's services for political work, yet defendant knowingly diverted the services of Ms. Sasinoski for her own benefit.  All Superior Court judicial employees were prohibited from participating in political activity.   Ms. Sasinoski testified that her judicial responsibilities included writing memorandum and opinions and proofreading other law clerks memorandum and opinions. (TT at 1073).  Her responsibilities as a judicial staff employee for the Pennsylvania Superior Court did not, and could not, involve political tasks.  However, between January 2003 and October 2003, 25% to 35% of Ms. Sasinoski's time was spent performing political campaign related tasks for the defendant while she was paid by the Commonwealth as a judicial staff employee for the Pennsylvania Superior Court. (TT at 1193).

Ms. Sasinoski performed the political tasks because she wanted to please the defendant and keep her job. (TT at 1105).  The defendant had hired her and could terminate her employment at any time.  Ms. Sasinoski was requested to perform the political tasks by either the defendant herself or through Janine Orie on the defendant's behalf.  Everyone in the office knew that Janine's request to perform political work was a directive from the judge. (TT at 1074).

Political tasks and events became part of the duties that the defendant expected her to complete. (TT at 1214-1215).  Ms. Sasinoski attended many political events with

the defendant, often on week-days during normal working hours. (TT at 1093-1097).  The defendant or Janine Orie would either stop by Ms. Sasinoski's officer to request that she attend a political event or they would write her a note. (TT at 1106).

Ms. Sasinoski also wrote speeches during working hours and printed them in the office. (TT at 1099).  She worked on questionnaires and compiled case lists to satisfy various political special interest groups. (TT at 1100-1101). Among other tasks, Ms. Sasinoski helped develop an Excel spreadsheet on the computers of the judicial chambers to track campaign contributors. (TT at 1114-1121).

During the 2003 political season, Ms. Sasinoski worked for the defendant and spent at least 25% of her day performing political work. (TT at 1193).  The computation used to value the services of judicial employees Lisa Sasinoski and Kathy Squires considered their salary without fringe benefits, using a 35 hour work-week, and the minimal percentage of time that the employee spent each day performing political campaign work. (TT at 2025).  The value of the political campaign work performed by Ms. Sasinoski in 2003 while she was a paid governmental judicial employee was $10,267.60. (TT at 2043).

Judicial employee Kathy Squires also did a significant amount of political campaign work during work-day hours. Ms. Squires worked for the defendant during the 2003 and 2009 political seasons.  She was employed by the Pennsylvania Superior Court as a judicial secretary for the defendant.  Ms. Squires worked 8:30 to 4:30 p.m., with an hour for lunch.  (TT at 1641-1642).  Her responsibilities as a judicial secretary included typing, filing, answering the telephone, taking care of legal books, and opening and distributing the mail. (TT at 1604).

During 2003 and 2009, Ms. Squires was given additional duties which benefitted the defendant's political campaign. (TT at 1605).  Janine directed that Ms. Squires complete these duties, although the defendant was Ms. Squire's actual supervisor (TT at 1606).  Ms. Squires was required to work on campaign contribution spreadsheets, campaign expense reports, and other campaign tasks. (TT at 1608).  She prepared a thousand or more thank you letters for the defendant's political campaign. (TT at 1630).

68

Ms. Squires spent three hours of her day on campaign related activities during most of 2003. (TT at 1614). From January to November of 2009, Ms. Squires spent five hours a week on campaign related activities. (TT at 1614-1615). The value of the political campaign work performed by Ms. Squires while she was paid as a governmental judicial employee was $8,961.18 in 2003 and $3,399.15 in 2009. (TT at 2045).

The total amount of political work performed by Superior Court Judicial staff employees Lisa Sasinoski and Kathy Squires and paid by the government in 2003 and 2009 was $22,627.93. (TT at 2048).

As specified above, there was sufficient evidence to support the conviction at Count 1 for theft of services. The evidence proved that the defendant had control over the disposition of the services of Ms. Sasinoski and Ms. Squires, which in 2003 and 2009 she used to facilitate and promote her political campaign, to which she was not entitled, and knowingly diverted such services to her own benefit and the value of the services was greater than $2,000.

Commonwealth Exhibit 73 at 17-19 (APP 2137-2139).

In addition to Judge Nauhaus' discussion of Count 1, the Commonwealth there was more testimony from other judicial employees, which established the offense. Linda Ollio, Superior Court of Pennsylvania computer analyst confirmed that she was asked to restore deleted files entitled "campaign" from a computer in petitioner's chambers and that Lisa and Kathy admitted to her that the files were political. (TT 1313-1329). Molly Creenan (law clerk) observed much political campaign work being done in the office on office equipment and did some herself-including answering political questionnaires and writing political speeches and case summaries for special interest political groups. (TT 1367-1443). Jack Degener (law clerk) answered political campaign questionnaires, worked the election polls, prepared case summaries for special interest groups, and copied campaign files for Janine Orie from the Superior Court computer

network. (TT 1487-1522). Cathy Skidmore (law clerk) often observed office printers and copiers being used for petitioner's campaign and personally took campaign fund checks to the bank to deposit, stuffed envelopes with campaign materials, signed campaign letters on petitioner's behalf, worked the polls on election day, and copied excel spreadsheets. (TT 1554-1602).

As to Count 2, Judge Nauhaus stated:

> At count 2 the defendant is charged with having control over the disposition of services of Janine Orie, which during 2003 and 2009, she utilized to facilitate and promote the defendant's political campaigns, to which she was not entitled, and knowingly diverted such services to her own benefit, and the value of the services was greater than $2,000.00.

> Janine Orie was extremely involved in the defendant's 2003 and 2009 political campaigns while she was employed by the Pennsylvania Superior Court as the head judicial secretary for the defendant's chambers. (TT at 1074-1076). As an employee of the Pennsylvania Superior Court, Janine Orie was prohibited from any involvement with the defendant's political campaign.  Janine Orie spent many hours performing political tasks and delegating political work for other employees to complete. (TT at 1606, 1610, 1625). Ms. Squires testified that Janine Orie was very busy at the defendant's chambers performing political campaign responsibilities. (TT at 1629).  She appeared to run the campaign, as the defendant's campaign manager. (TT at 1087, 1227, 1629).  Janine Orie was the person Jamie Pavlot would speak with on a regular basis regarding campaign tasks when the defendant was not available.  (TT at 210).  Janine Orie kept a calendar with the defendant's campaign related events at the office.  (TT at 1110).  Janine Orie sent numerous emails to the Senatorial staff of Jane Clare Orie.  The campaign duties that Mr. Dott was required to complete were assigned by Jamie Pavlot and Janine Orie. (TT at 887).

> There was overwhelming evidence to prove that the defendant had control over the disposition of services of Janine Orie, which during 2003 and 2009, she utilized to

facilitate and promote … her political campaign, to which she
was not entitled, and knowingly diverted such services to her
own benefit, and the value of the services was greater than
$2,000.00.

Commonwealth Exhibit 73 at  20-21 (APP 2140-2141).

As to Count 3 Judge Nauhaus stated:

At Count 3 the defendant is charged with having
control over the disposition of services of the Senatorial staff
of Jane Clare Orie which during 2003 and 2009, she
personally and through accomplices Janine Orie and Jane
Clare Orie, utilized to facilitate and promote the defendant's
political campaigns, to which she was not entitled, and
knowingly diverted such services to her own benefit, and the
value of the services was greater than $2,000.00.

The Senatorial staff of Jane Clare Orie was required
to work 37.5 hours a week.  The value of the services
diverted to benefit the defendant was based on the salary of
the senate employee, the percentage of time spent on
political campaign work, and a 37.5 hour work-week. (TT at
601, 2025).    This computation was used for Senate
employees Jamie Pavlot, Barbara Brown, Jason Davidek,
Joshua Dott and Audrey Rassmussen Mackie.  (TT at 2025).
The Commonwealth's expert forensic accountant used the
Senatorial staff employee's lowest estimate of the portion of
their day that was spent on political activities, and the
highest estimate of the hours the employee worked each
day.

Jamie Pavlot testified that 2 ½ hours of each day was
devoted to political work and she worked a 10 hour day. (…)
Senate employee Barbara Brown's testimony demonstrated
that a minimum of 1 ½ hours of her work-day was spent on
political work that was paid for by the government, for a total
of $4,809.00. (…) Senate employee Jason Davidek worked
a regular 7 ½ hour day and at least 30% of his day was
devoted to political work. (…) Senate employee Joshua Dott
worked a regular 7 ½ hour day 3 days a week as an intern
and 5 days a week as an employee and at least 25% of his
day was devoted to political work ….Senate employee
Audrey Rasmussen Mackie worked a regular 7 ½ hour day
and 25% of her day was devoted to political work from

> January 2009 to April 2009....The total amount of political work performed by the Senatorial staff of Jane Clare Orie and paid by the government was $8,473.90 in 2003 and $2,373.88 in 2009.

Commonwealth Exhibit 73 at 22-23 (APP 2142-2143).

On appeal, the Superior Court of Pennsylvania addressed this claim as follows:

> With respect to her conviction under Count 1 for diversion of the services of her judicial staff, Orie Melvin directs our attention to the trial testimony of David Kutz ("Kutz"), AOPC's Director of Human Resources, who indicated that judges on the Superior Court have the authority to set office policy for members of their judicial staff, including how many hours the law clerks and secretaries work. N.T., 2/6/2013, at 1704–06. Kutz further testified that law clerks and secretaries did not have to fill out time sheets to get paid. *Id.* at 1727. Based upon this testimony, Orie Melvin contends that she was "vested with complete discretion to direct the work of her staff and secretaries" and that there was "no requirement that those employees devote any particular number of hours to their judicial assignments." Orie Melvin's Brief at 82.

> We cannot agree that Kutz's testimony precluded a finding that Orie Melvin diverted services within the meaning of subsection 3925(b). At most, Kutz's testimony established that Superior Court judges have the discretion to set office policy and the number of hours per week that employees are expected to work—in other words, to prescribe how and in what manner the ***judicial functions*** of their office are carried out. This in no way leads to a conclusion that Superior Court judges have any authority to divert the services of judicial employees ***to their own personal benefit.***

> No judicial employee testified that he or she performed political services on a volunteer basis. For example, Sasinoski testified that she performed political tasks for Orie Melvin's campaign so that she could keep her job, even though she knew that doing so was wrong. N.T., 2/1/2013, at 1105. Degener also testified that he thought that doing political work was wrong, but that Orie Melvin was his supervisor and he did not believe that objecting to doing the work would "stop it." *Id.* at 1491, 1497. Squires testified that

the political work she did was outside her "judicially required responsibilities," but that she performed the political tasks assigned to her because "it was given to me by [Janine Orie] to complete during my workday." *Id.* at 1605–06.

With respect to her conviction under Count 3 for diversion of the services of Jane Orie's legislative staff, Orie Melvin claims that the Commonwealth offered no evidence to prove that she had control over the services of those employees, and that no legislative employee testified that Orie Melvin directed them to perform any political work on her behalf. Orie Melvin's Brief at 83.

In rejecting this argument, the trial court noted that numerous members of Jane Orie's legislative staff testified that they performed a substantial quantity of political work on Orie Melvin's political campaigns. Trial Court Opinion, 9/12/2013, at 22. The certified record supports this finding. In this regard, Pavlot testified that that she received numerous directives to perform political activity from both Jane Orie and Janine Orie, and that Jane Orie specifically advised her any order she received from either Janine Orie and/or Orie Melvin was to be treated as an order directly from her:

> Q. Why would you take orders from either [Janine Orie or Orie Melvin]?
>
> A. Because [Jane Orie] told me, she told me from the beginning, she said, look, if either of my sisters, Janine or Joan, ever give you a directive or a request, whatever it might be, you need to follow that as though I were telling you to do that.
>
> Q. As a practical matter, did you receive requests from either [Janine Orie or Orie Melvin] that were political or campaign related?
>
> A. Yes sir, I did.

N.T., 1/28/2013, at 199.

*Commonwealth v. Orie Melvin*, 103 A.3d at 40-41 Commonwealth Exhibit 102 (APP 3011-3012).

As to Count 4 Judge Nauhaus held:

At Count 4, the defendant was charged and convicted of Criminal Conspiracy in that the defendant, with the intent of promoting or facilitating the crime of theft of services, diversion of services, conspired and agreed with Janine Orie and/or Jane Clare Orie that they or one or more of them would engage in conduct constituting such crimes or an attempt or solicitation to commit such crimes and in furtherance thereof committed one or more of the following overt acts: directed staffers from both Judge Orie Melvin's Superior Court staff as well as staff members of Senator Jane Clare Orie's legislative office, to facilitate and promote the defendant's election campaigns for higher judicial office in both 2003 and 2009, in violation of 18 Pa.C.S.§903(a)(1). The evidence as described above overwhelmingly proved the conviction at Count 4.

Commonwealth Exhibit 73 at 23-24 (APP 2143-2144).  The following is just one more example of the conspiracy:

[Testimony of Jamie Pavlot:]

Q    Let's go to the lower portion of that document and especially the entry dated April 21, "Joan to Johnstown", is that correct?  Is that what that says?

A    Yes, it does.

Q    Were there in fact, or was there a request for comp time to be earned from whatever that particular task was?

A    Yes.

Q    Do you know what that task was?

A    Sharon was driving Judge Melvin to some event in Johnstown.

Q    How did Sharon come to do that, if you know?

A    Senator asked me to have Sharon do that.

Q    But she was going to be working after hours, correct?

A    Yes, sir.

Q      And she is getting credit for having done legislative work.  That's what the comp time if for, is that correct?

A      Yes.

Q      Why would you approve that?

A      Because Senator said it was okay.

(TT 205-206; 207).

On appeal, the Superior Court of Pennsylvania addressed this claim as follows:

Furthermore, on appeal Orie Melvin does not challenge the sufficiency of the evidence in support of her conviction under Count 4 for conspiring with Jane Orie and Janine Orie to divert the services of Jane Orie's legislative staff to her political campaigns. Accordingly, even if Orie Melvin did not herself direct members of Jane Orie's legislative staff to perform political tasks on her behalf, she is nevertheless responsible for all of the acts of both Janine Orie and Jane Orie in doing so. *See, e.g., Commonwealth v. Murphy,* 795 A.2d 1025, 1038 (Pa.Super.2002) ("Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his coconspirators in furtherance of the conspiracy."), *affirmed,* 577 Pa. 275, 844 A.2d 1228 (2004).

*Commonwealth v. Orie Melvin*, 103 A.3d at 41. Commonwealth Exhibit 102 (APP 3012).

In discussing Count 5, Judge Nauhaus wrote:

At Count 5, the defendant was charged and convicted of Misapplication of Entrusted Property of Government or Financial Institutions, in that the defendant applied or disposed of property valued at more than $50.00, namely personally and through Janine Orie, an accomplice pursuant to 18 Pa.C.S. §306, used her Superior Court office facilities and office equipment to facilitate and promote the defendant's political campaign activities in her bid for higher judicial office in both 2003 and 2009, that had been entrusted to the defendant as a fiduciary, or property of the government or of a financial institution, in a manner which said defendant knew was unlawful and involved substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted, in

75

violation of Sections 4113(a) and (b) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa.C.S. §4113(a) & (b).

The evidence proved the defendant used the Superior Court's office and equipment for her political campaign. Lisa Sasinoski testified that sometimes she would have to wait at the Superior Court office's only printer while it was being used by Janine Orie for political campaign material. (TT at 1122). Excel spreadsheets tracking campaign contributions existed on the Superior Court's computers for all of the defendant's staff to access. (TT at 1114). Kathy Squires testified that Janine Orie used the computers, printer, photocopier and fax machine for campaign work. (TT at 1610).

As specified above, there was sufficient evidence to support the conviction at Count 5. The defendant used Superior Court office facilities and equipment, valued at more than $50.00, personally and through Janine Orie, to facilitate and promote her political campaign thereby committing the criminal offense of misapplication of entrusted governmental property.

Commonwealth Exhibit 73 at 24-25 (APP 2144-2145).

The following testimony of Molly Creenan (law clerk) is another example:

Q      Do you know what a political poll card is, ma'am?

A      I believe that was what was put in the bags that we were asked to pass out for the election in 2003.

Q      Did you ever see any of those in either 2003 or at any time during the election campaign actually being produced in the office?

A      I recall in 2009 Janine was actually making the cards in the office with a paper cutter.

Q      So she was actually cutting a larger piece into the individual poll cards?

A      Yes.

Q      This is Janine Orie?

A       Yes.

Q       How about thank you cards?  Do you know what they are in relationship to a political campaign?

A       I recall observing thank you letters to contributors that were being printed out of our printer and Janine was printing them out.  I spoke to her about them, and I said you can't be doing this.  And she had said to me, I'm using a laptop.  And that didn't make any sense to me because I didn't see her using a laptop and I saw her using the printer to print out all of these letters.

(TT 1395-1396).

On appeal, the Superior Court of Pennsylvania addressed this claim as follows:

The trial court found that the Commonwealth had introduced sufficient evidence to support this conviction based upon testimony that Orie Melvin, either directly or through others at her direction (including Janine Orie), had used Superior Court office facilities and office equipment for political campaign activities. Trial Court Opinion, 9/12/2013, at 24–25. On appeal, Orie Melvin contends that the Commonwealth did not introduce any evidence to prove that she applied or disposed of entrusted property "in a manner which was unlawful and involved substantial risk of loss or detriment to the owner of the property." Orie Melvin's Brief at 84.

We conclude that this issue has not been preserved for appellate review. In her statement of errors complained of on appeal, Orie Melvin states only that there was insufficient evidence to support her conviction under subsection 4113(a), but does not identify the specific element of the offense for which insufficient evidence was allegedly presented. As a result, the trial court did not address in its Rule 1925(a) written opinion the specific issue now presented. For these reasons, we find the issue to be waived.

*Commonwealth v. Orie Melvin*, 103 A.3d at 41. Commonwealth Exhibit 102 (APP 3012).

Finally, as to Count 7, Judge Nauhaus ruled:

At Count 7, the defendant is charged and convicted of Criminal Conspiracy, in that the defendant, with the intent of promoting or facilitating the crime(s) of Tampering with Physical Evidence, conspired and agreed with Jane Clare Orie that they, or one or more of them, would engage in conduct constituting such crime(s) or an attempt or solicitation to commit such crime(s),and in furtherance thereof committed one or more of the following overt acts: believing that an official investigation was pending or about to be initiated, encouraged or requested Jamie Pavlot to engage in conduct that would constitute the crime of Tampering with Physical Evidence, or that would establish the defendant's complicity in said crime, when on or about early November, 2009, the defendant, while on a telephone call with Senator Jane Orie and Senator Jane Orie's chief of staff, Jamie Pavlot, told Jamie Pavlot to remove any political documents from two boxes of materials which Jamie Pavlot had removed from Senator Jane Orie's senatorial district office, in violation [of] 18 Pa.C.S. §903(a)(1).

Jamie Pavlot testified that the following telephone conversation occurred:

> …[Jamie Pavlot] received a phone call from Jane Orie and she said Jamie, this is Jane, I have Joan on the phone.  Joan said, hi, Jamie.  I said hi, Judge.  And they said to me, both of them had identified themselves and said to me, Jamie, what's in those boxes.  And I said, well, there are a number of things in the boxes.  What are in the files?  I said it appears to be some expense reports, it appears to be some contributors lists, looks like some political literature is in there, some other miscellaneous things are in there.  And Jane said, Jamie anything that's political of mine, I want you to pull those files out of those boxes.  And the Judge said, Jamie, anything political of mine, I want you to also pull them out of those boxes.  And I said, okay.  But I didn't do it. (TT 333-334)

Commonwealth Exhibit 73 at 25-26 (APP 2145-2146).

On appeal, the Superior Court of Pennsylvania addressed this claim as follows:

> Orie Melvin argues that there was no proof of either an agreement with Pavlot and/or Jane Orie to tamper with

evidence, or that she intended to facilitate or promote the crime of tampering. Orie Melvin's Brief at 85. We disagree. Pavlot testified that after she and others in Jane Orie's legislative office became aware that a student intern (Jennifer Knapp Rioja) had reported improprieties to the Allegheny County District Attorney's office, she and Dott removed two boxes of documents from the office file drawers. N.T., 1/29/2013, at 330. When they were removing the boxes from the office, she thought she saw flashes from a camera, and immediately contacted Jane Orie to report that she believed someone had taken pictures of the removal of the boxes. *Id.* at 331. Pavlot testified that she took the boxes to her basement and planned to give them to her attorney, but before she could do so she received a telephone call from Jane Orie and Orie Melvin, which she described as follows:

> I received a phone call from Jane Orie and she said, Jamie, this is Jane, I have [Orie Melvin] on the phone. [Orie Melvin] said, hi, Jamie. I said, hi, Judge. And they said to me, both of them had identified themselves and said to me, Jamie, what's in those boxes. And I said, well, there are a number of things in the boxes. What are in the files? I said it appears to be some expense reports, it appears to be some contributors lists, looks like some political literature is in there, some other miscellaneous things are in there.
> And [Jane Orie] said, Jamie, anything that's political of mine, I want you to pull those files out of those boxes. And [Orie Melvin] said, Jamie, anything political of mine, I want you to pull them out of those boxes. And I said, okay. But I didn't do it.

*Id.* at 333–34.

Viewing Pavlot's testimony in the light most favorable to the Commonwealth as the verdict winner, as our standard of review requires, there is sufficient evidence to support a conspiracy between Orie Melvin, Jane Orie, and Pavlot to tamper with evidence. Orie Melvin argues that phone records do not establish that such a telephone call was ever made, but it is not for this Court to pass upon Pavlot's credibility. *Estepp,* 17 A.3d at 943–44. An argument regarding the credibility of a witness's testimony "goes to the weight of the evidence, not the sufficiency of the evidence."

> *Commonwealth   v.   Gibbs,* 981 A.2d 274, 281–82
> (Pa.Super.2009), *appeal denied,* 607 Pa. 690, 3 A.3d 670
> (2010). Orie Melvin has not asserted a weight of the
> evidence claim.

*Commonwealth v. Orie Melvin*, 103 A.3d at 43. Commonwealth Exhibit 102 (APP 3013).

When deciding this claim under AEDPA, the federal courts must apply the presumption of correctness regarding factual and legal conclusions reached by the state courts as contained in 28 U.S.C.A. §2254 (d) and (e).

The state court's decision was not clearly contrary to federal law as determined by the Supreme Court of the United States. Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. at 698-699, 122 S.Ct. at 1852. Thus, petitioner would not be entitled to habeas relief. 28 U.S.C.A. §2254(d)(1); *Williams v. Taylor*, *supra.*.

**2.      The prosecutor failed to search for exculpatory evidence in violation of Brady and Orie Melvin was denied access to evidence in violation of the Fifth and Sixth Amendments.**

Second, petitioner claims that she was not permitted to examine all of the electronic evidence seized. In the present case, all evidence seized from the computers and server in Senator Orie's office had to go through a screening process established by the Honorable John A. Zottola, Supervising Judge of the Grand Jury.   That procedure involved a court appointed Special Master examining the contents of the computers and server which had been searched by a Pennsylvania State Trooper

appointed by the Grand Jury Judge to assist the Court and the Master, using the search terms specified in the search warrants.  The District Attorney Office did not participate in these content searches and had no control over the items of evidence being withheld by the Master or turned over for its prosecution. The procedure was instituted after the Senate Republican Caucus and Senator Orie raised issues of privilege.

The decisional law under *Brady v. Maryland*, *supra*. has been summarized as follows:

> The principles enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), protect a defendant's rights under the Fifth Amendment by requiring that a prosecutor disclose material exculpatory evidence to the defense. Where the prosecutor fails to do so, regardless of whether the omission was intentional or a product of bad faith, the defendant is entitled to a new trial—or, if pertinent, a new penalty phase—provided that the withheld materials were material to guilt or innocence or to punishment. These core teachings of *Brady* have been consistent throughout the United States Supreme Court's ensuing decisions; the Court has in its later decisions clarified that the "prosecutor's" obligation to disclose extends to "any favorable evidence known to the others acting on the government's behalf in the case, including the police," and the "exculpatory" materials include impeachment evidence. The standard for materiality is the same as that iterated in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the United States Supreme Court summarized:
>
> > [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*,

> 514 U.S. at 314, 115 S.Ct. 1555, 131 L.Ed.2d
> 490 (*quoting United States v. Bagley*, 473 U.S.
> 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481
> (1985)).

*Marshall v. Hendricks*, 307 F.3d 36, 52-53 (3rd Cir. 2002).  *See Strickler v. Greene*, 527

U.S. 263, 119 S.Ct. 1936 (1999). The Supreme Court of the United States has stated:

> the term "*Brady* violation" is sometimes used to refer to any
> breach of the broad obligation to disclose exculpatory
> evidence—that is, to any suppression of so-called "*Brady*
> material"—although strictly speaking, there is never a real
> "*Brady* violation unless the nondislosure was so serious that
> there is a reasonable probability that the suppressed
> evidence would have produced a different verdict. There are
> three components of a true *Brady* violation: The evidence at
> issue must be favorable to the accused, either because it is
> exculpatory, or because it is impeaching; that evidence must
> have been suppressed by the State, either willfully or
> inadvertently; and prejudice must have ensued.

*Strickler v. Green*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 1948 (1999). In order to

demonstrate a *Brady* violation, the defendant must demonstrate that "the favorable

evidence could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." *Kyles v. Whitney*, 514 U.S. 419, 435, 115 S.Ct.

1555, 1567 (1995). *See Slutzker v. Johnson*, 393 F.3d 373, 386, n.13 (3rd Cir. 2004);

*United States v. Earnest*, 129 F.3d 906 (7th Cir. 1997).

Petitioner sought to examine the original hard drives even though the Senate

Republican Caucus had not yet waived any privilege.  Petitioner provided the court with

no procedure to protect privileged documents.  It is not clear as to whether petitioner's

counsel understood that the Senate Republican Caucus had in its possession an

accurate forensic image/copy of all the materials and underlying data, which they

caused to be made by an outside forensic computer firm:

On December 21, 2012, at a hearing before Judge Zottola, petitioner's counsel informed the court that he wanted the originals but the Senate Republican was still insisting on invoking privilege:

> MR BRIER: (…)  So respecting privilege, we get to see that which is the original source, no more than that, subject to privilege.  That's what their expert saw.
>
> DETECTIVE GRABER:    Your Honor, if I could clarify something, I apologize for interrupting.  My understanding is what Trooper Lucas did was when they speak of mirroring those drives or thumb drives, whichever the case may be, it's my understanding that what Trooper Lucas does is he creates a forensically sound copy of the drive in its entirety and sets that drive aside.
>
> The process by which he does that, there's a verification process that he uses to indicate whether the imaging was accurate or not, and it's my understanding that that process that he used was accurate.
>
> He then worked off of those images, and the original evidence was maintained intact within evidence.  And as far as those images, I believe there was a point in timer at which the caucus requested access to that process and they have their experts present when those images were made.
>
> In fact, duplicate images were made and provided to the caucus as well.  So those images are the ones that - - I don't believe that there would be any problem providing duplicates.
>
> If they have an expert, that expert certainly should be able to determine whether or not those images were created in a proper and forensically sound way without having to provide access to original evidence, first and foremost.
>
> Secondarily, I also believe that the caucus has those duplicate images of those drives, that if they are working in conjunction with the defense, certainly they would be able to provide their copies or their images for the defense to look at as well as a suggestion.
>
> MR. BRIER:  Your Honor, the starting point is the original

source evidence.

JUDGE ZOTTOLA:  All right.  If you get the original, they get the original, too.  What it does is it eliminates the safeguards that the Court put in place with respect to privileged information.

I put the special master in place because of that, because originally the District Attorney's officer was going to put a - - I can't remember the name of the term you used.

I created a special master to avoid what would in my mind be a problem.  We get right back there if that's what you want.  If you want to see it, they get to see it, too.  That's fine by me.

MR BRIER:   Subject to the protocol that the Republican Caucus is going to say you can't look at privileged - -

JUDE ZOTTOLA:  No.  You can't have it both ways.  You can't have it both ways.  If you want the entire thing - - because what they did was they took the entire thing.  They mirrored it, gave it to someone the Court trusted to be able to say what's privileged, and I said assume everything is privileged.

And that's what they did.  They only got what came through the strainer.  If you're asking for the whole thing, they get the whole thing too.  And if they attempt in a trial to use something that's privileged, well, appropriate objections take place.

If that's what you want, you can have it, but they get it too.

(HT, 12/21/2012, 49-52).

Petitioner's counsel was mistaken when he asserted that the Commonwealth's Expert had seen the "original source."  The "original source" was viewed by the Special Master.  The State Trooper was working for the Grand Jury Judge and the Court, not the District Attorney, when he would follow the Master's directives and redact privileged information and supply the Commonwealth with non-privileged materials.

At a subsequent hearing petitioner again told the court that she wanted all of the evidence, including that which had been found by the Special Master to be privileged. Judge Zottola informed counsel that even though she represented to the court that the Senate Republican Caucus was now going to waive privilege, the Caucus had not communicated that to the Court:

> JUDGE ZOTTOLA: Mr. Haverstick has not sent correspondence to this Court personally that he's not exercising or claiming privilege on behalf of the Senate Republican Caucus. Prior to this, and I was not the supervising judge of the most recent Grand Jury. I was the supervising judge of the prior grand jury. And, boy, he was kicking and screaming.
>
> For him to say that he was not exercising a privilege astonishes me. It really astonishes me at this point. Go ahead Mr. Claus.
>
> MR. CLAUS: I want to put on the record, I cannot authenticate what was just said by defense counsel. In fact, to the best of my understanding, that privilege is still out there. The claim of privilege - -
>
> JUDGE ZOTTOLA: I agree with you, and we went painstakingly to make sure that the senator was protected both from the privilege legislatively as well as any potential attorney-client privilege, knowing that she's an attorney, and any other privilege, and we set up this procedure.
>
> My inclination is to let the procedure remain and not make changes to what I've done. I mean, we spent a lot of time, a lot of effort and energy making sure that that existed, and I'm not sure what admissibility issues now come about with respect to privileged evidence that's already been determined to be privileged by the master.

(HT, 1/11/2013, 17-19).

Judge Zottola then refused to allow petitioner blanket access to the original hard drives and server. That did not stop petitioner from being able to access the forensic

copy which the Caucus had had their forensic expert make.   Given that the Commonwealth had never possessed the entire contents, that there are many privileged items that were not disclosed, and that the trial court had undertaken efforts to protect the privileged nature of the data at the insistence of both the Senate Republican Caucus and Senator Jane Orie, the decision of Judge Zottola was not an abuse of discretion.   In this case, petitioner received all information found not to involve privilege and the Senate Republican Caucus, had it wanted to, could have given her access to the forensic copy of hard drive data which its expert made.   She has not established any reason why Judge Zottola should have violated the very procedures demanded to be implemented by the Senate Republican Caucus and Senator Orie to protect privileged materials.

The Commonwealth did not search Superior Court of Pennsylvania's computers. The Commonwealth issued subpoenas asking the Administrative Office of Pennsylvania Courts (AOPC) to search the Superior Court computer system for certain key search terms. AOPC co-ordinated that search with Superior Court personnel. (HT, 11/19/2012, 5).   AOPC refused to allow petitioner to have an expert search their computers and petitioner's counsel admitted that this was not a discovery issue because the Commonwealth did not control access. (HT, 11/19/2012, 5, 8, 9), (HT, 12/14/2012, 8-18).   AOPC arranged to have petitioner conduct depositions of the Superior Court personnel involved in responding to the Commonwealth's subpoenas. Petitioner had received a large amount of information from Superior Court during pretrial discovery. *See* Commonwealth Exhibit 59 (APP 1138-1143); Commonwealth Exhibit 60 (APP 1144-1831). Peter Liebert, program analyst from Superior Court, explained that when a

judge leaves the court her computer is not "imaged" and that when petitioner ascended to the Supreme Court Bench, the server in her office was cleaned of its files and the server was given to Judge Strassburger.  Link files could not be recovered and there was no way to determine the content of Janine Orie's link files *See* Commonwealth Exhibit 59 (APP 1138-1143); Commonwealth Exhibit 60 (APP 1144-1831).   Julia Varano, Superior Court's Information Management Systems Coordinator supported that testimony indicating that at the time of this investigation Superior Court did not do back-up tapes and no files had been captured. *See* Commonwealth Exhibit 59 (APP 1138-1143); Commonwealth Exhibit 60 (APP 1144-1831). Charles Lanard, Superior Court program analyst echoed that testimony. Although he got some "hits" using search terms he did not find any incriminating content. Superior Court had only recently begun to make copies of C-drives and H-drives.  *See* Commonwealth Exhibit 59 (APP 1138-1143); Commonwealth Exhibit 60 (APP 1144-1831). Petitioner noted in her pretrial filings that there was no relevant information obtained from the Superior Court's electronic data base. *See* Commonwealth Exhibit 59 (APP 1138-1143); Commonwealth Exhibit 60 (APP 1144-1831). A. Taylor Williams, Esquire, counsel for AOPC explained the Judiciary's rationale for not allowing a third party search of its computer system:

> 5.     Contrary to the defense's apparent belief, the Commonwealth did not physically examine any appellate court data sources. Instead, it subpoenaed specific information.  The Supreme and Superior Court's respective IT staff ran focused searches for that particular information and supplied only the results of the specific searches to the Commonwealth.
>
> 6.     The Judiciary would have objected to any Commonwealth request to have physical access to court data sources or to a more wide-ranging search: that would have exposed privileged and confidential information,

including the appellate Courts' judicial decision-making functions, deliberative processes, attorney client privileged material and attorney work product.

7.     The October 29th Order is directed to AOPC, however AOPC did not provide any electronic information from AOPC data sources to the Commonwealth, and no AOPC data sources were searched.  The AOPC provides legal counsel to the Supreme and Superior Courts under Rule of Judicial Administration 505 (15), and, as to the subpoenaed searches, acted only as counsel to the Supreme and Superior Courts.

8.     The AOPC itself does not have the ability to grant access to the Supreme or Superior Courts' respective data sources, and the Court's Order directed to the AOPC does not have the effect of giving access to Supreme or Superior Court data sources.

9.     The defense's request to have unfettered access to the Supreme and Superior Court data sources goes far beyond the Commonwealth's specific, narrowly focused and limited subpoena requests, and is objectionable for numerous reasons including:

> a.    the appellate courts' data sources contain confidential information concerning Supreme Court cases and information about Superior Court judges' and Supreme Court Justices' privileged judicial decision-making functions—including internal emails, draft opinions, allocatur reports, and similar sensitive documents related to judicial functions, *see Leber v. Stretton,* 928 A.2d 262, 270 (Pa. Super. 2007)(holding that the judicial decision-making process may not be explored or elicited by subpoena); and

> b.    the request would reveal the appellate courts' deliberative process and information covered by the attorney-client and work product privileges, like communications with judicial law clerks, other judges and justices, as well as the courts' attorneys, *see Commonwealth v. Vartan,* 733 A.2d 1258, 1265 (Pa. 1999) (stating that the deliberative process privilege applies to information about confidential legal and policymaking deliberations reflecting opinions, recommendations, and advice).

>10.   No mechanism is available to limit a search to information relevant only to this case.  So if this Court were to grant physical access to the data sources, it would open the Supreme and Superior Court data sources to a wanton, unrestrained discovery exploration.   Simply put, allowing either the Commonwealth or the defense physical access to the data sources exposes all judicial data—confidential and privileged—to that party.

*See* Commonwealth Exhibit 28. (APP 385-423)

Petitioner has failed to identify that any *Brady* violation in fact occurred. Petitioner has not demonstrated what if any information favorable to her was suppressed. Further, petitioner has failed to demonstrate what prejudice may have ensued. Thus, petitioner cannot demonstrate a *Brady* violation.   In order to demonstrate a *Brady* violation, the defendant must demonstrate that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitney*, 514 U.S. 419, 435, 115 S.Ct. 1555, 1567 (1995). *See Slutzker v. Johnson*, 393 F.3d 373, 386, n.13 (3rd Cir. 2004);

Regarding the data from Senator Jane Orie and the Senate Republican Caucus, the Superior Court addressed the claim as follows:

>We disagree for several reasons. First, Orie Melvin has not cited to any evidence in the certified record to support her claim that the Commonwealth had any opportunity to search the original computer equipment seized from Jane Orie's office. As set forth hereinabove, the District Attorney's office had no access to the original computer equipment or other evidence seized from Jane Orie's office, as it was within the exclusive control of Judge Zottola and the Special Master. Both the District Attorney and Orie Melvin received the same access to the same nonprivileged evidence forthcoming after the privilege reviews. In her appellate brief, Orie Melvin has not identified for this Court any evidence the Commonwealth introduced at trial obtained from Jane Orie's office to which she was denied access (either by the trial court, Judge

Zottola, or the Commonwealth).

Second, *Brady* and Rule 573 set forth the Commonwealth's obligations to provide discovery materials that are within its possession to the defense. See Pa.R.Crim.P. 573(B)(1) ("the Commonwealth shall disclose to the defendant's attorney"); *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 253 (2008) (the Commonwealth does not violate disclosure rules when it fails to disclose to the defense evidence that it does not possess and of which it is unaware); *see also Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 97 (2004) (citing *Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997), *abrogated on other grounds by Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136 (2001)). As a result of the procedures established by Judge Zottola, the Commonwealth here did not have custody or control of the original computer equipment sought by Orie Melvin, and had no ability to produce it to Orie Melvin. As a result, Orie Melvin has not established a violation of the Commonwealth's obligations under *Brady* or Rule 573.

Finally, no *Brady* violation occurs when the evidence is available to the defense through non-governmental sources. *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 244–45 (2006), *cert. denied,* 552 U.S. 954, 128 S.Ct. 384, 169 L.Ed.2d 270 (2007); *Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 696 (2003); *Paddy,* 800 A.2d at 305. The certified record in this case establishes that the non-governmental entities asserting privilege claims with respect to the evidence in question, including the Senate Republican Caucus and Jane Orie, had duplicate copies of the hard drives removed from Jane Orie's office. N.T., 1/11/2013, at 18–19. Orie Melvin could presumably have obtained the requested access to these sources from one or more of these entities or individuals.

*Commonwealth v. Orie Melvin*, 103 A.3d at 33-34. Commonwealth Exhibit 102 (APP 3006-3007). Regarding the AOPC data, the Superior Court held as follows:

No *Brady* or Rule 573 issues are presented here, as Orie Melvin does not suggest that the Commonwealth had possession or control of the Superior Court's computers. Accordingly, we review the trial court's denial of Orie Melvin's discovery motion for an abuse of discretion. *Commonwealth v. Mendez,* 74 A.3d 256, 260

(Pa.Super.2013), ("Generally, on review of an order granting or denying a discovery request, an appellate court applies an abuse of discretion standard."), *appeal denied,* —— Pa. —— , 87 A.3d 319 (2014). Here we find no abuse of discretion. Orie Melvin offered no basis to dispute the AOPC's contention that permitting access to the Superior Court's computers would provide unauthorized access to a myriad of privileged and confidential documents, and offered no specific procedures or methods that could have been employed to satisfy the AOPC's confidentiality and privilege concerns. Moreover, to the extent that Orie Melvin sought evidence from the Superior Court's computers that had not been produced by the AOPC in response to the Commonwealth's subpoenas, Orie Melvin could have issued her own subpoena to the AOPC requesting the production of such information. The certified record does not reflect that she ever did so.

*Commonwealth v. Melvin*, 103 A.3d at 34-35. Commonwealth Exhibit 102 (APP 3007-3008).

When deciding this claim under AEDPA, the federal courts must apply the presumption of correctness regarding factual and legal conclusions reached by the state courts as contained in 28 U.S.C.A. §2254 (d) and (e).

The state court's decision was not clearly contrary to federal law as determined by the Supreme Court of the United States. Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. at 698-699, 122 S.Ct. at 1852. Thus, petitioner would not be entitled to habeas relief. 28 U.S.C.A. §2254(d)(1); *Williams v. Taylor, supra..*

**3. Orie Melvin was denied any opportunity to challenge the prosecutor's direct and indirect use of her personal emails which were seized pursuant to an unconstitutional warrant.**

Third, petitioner asserts that the two search warrants which permitted the Commonwealth to seize and search her private Yahoo! accounts at oriemelvin@yahoo.com, judgeoriemelvin4supreme@yahoo.com, and orieonthemove@yahoo.com were unconstitutionally overbroad. The Superior Court of Pennsylvania agreed that the warrants were overbroad, but concluded that the failure to suppress was harmless. The conclusion was based upon a complete review of the record.

Generally, Fourth Amendment exclusionary relief is not available in federal habeas corpus proceedings. *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052 (1976). In *Marshall v. Hendricks*, 307 F.3d 36 (3rd Cir. 2002), the Third Circuit stated:

> In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court examined the nature of the exclusionary rule, which it characterized as a "judicially created means of effectuating the rights secured by the Fourth Amendment" and balanced its utility as a deterrent against the risk of excluding trustworthy evidence and thus "deflect[ing] the truthfinding process." *Id.* at 482, 490, 96 S.Ct. 3037. Finding that, as to collateral review, the costs of the exclusionary rule outweighed the benefits of its application, the Court concluded that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. 3037. While the federal courts are not thus deprived of jurisdiction to hear the claim, they are—for prudential reasons—restricted in their application of the exclusionary rule. *Id.* at 494 n. 37, 96 S.Ct. 3037.
>
> Seeking to avoid this restriction, Marshall seizes upon the qualifying phrase in *Stone*, "where the State has

provided an opportunity for full and fair litigation," and argues that he has not had an opportunity for full and fair litigation, and thus, that the bar of *Stone v. Powell* should not apply.[34] Appellant's Memorandum of Law in Support of Application for Certificate of Appealability 131–143.

We have recognized that there may be instances in which a full and fair opportunity to litigate was denied to a habeas petitioner, but this is not one of them. This is not a case where a structural defect in the system itself prevented Marshall's claim from being heard. *See, e.g.*, *Boyd v. Mintz*, 631 F.2d 247, 250–51 (3d Cir.1980); *see also Gilmore v. Marks*, 799 F.2d 51, 57 (3d Cir.1986) (observing that a state's "failure to give at least colorable application of the correct Fourth Amendment constitutional standard" might amount to a denial of the opportunity for full and fair litigation). An erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the bar. *Id.* And, as the District Court correctly assessed, *Marshall III*, 103 F.Supp.2d at 785–86, Marshall is at most alleging that the Fourth Amendment claims were decided incorrectly or incompletely by the New Jersey courts, allegations which are insufficient to surmount the *Stone* bar.

*Marshall v. Hendricks*, 307 F.3d at 81-82. Consequently, petitioner is not entitled to relief on this type of claim.

Petitioner claims that a "structural defect" prevented petitioner from litigating the case in state court. This is simply not the case. On appeal, the Superior Court of Pennsylvania addressed the claim as follows:

Pursuant to our analysis in *Orie,* therefore, we must conclude that the warrant authorizing the seizure of Orie Melvin's personal emails at *oriemelvin @yahoo.com* and *judgeoriemelvin4supreme @yahoo.com* was overbroad. Unfortunately, however, while Orie Melvin contends that her convictions should be reversed and she should be granted a new trial, Orie Melvin's Brief at 35, she has not offered this Court any legal basis for granting such relief. Similarly, the Commonwealth does not attempt to address the proper remedy in this case for the trial court's failure to suppress the emails obtained pursuant to the warrant in question.

\*     \*     \*     \*

Based upon our review of the entire certified record on appeal, the trial court's failure to suppress the contents of Orie Melvin's email account was harmless error.

At trial, the Commonwealth introduced 10 emails into evidence from Orie Melvin's email account obtained pursuant to the overbroad warrant.[9] Six of these emails[10] were to or from Molly Creenan ("Creenan"), a member of Orie Melvin's judicial staff from January 1998 through December 2009. N.T., 2/4/2013, at 1367. While Creenan's tenure on Orie Melvin's judicial staff spanned both the 2003 and 2009 political campaigns, given the scope of the warrant, the emails at issue here relate only to the 2009 campaign.[11] As a result, these six emails did not prejudice Orie Melvin, or the prejudice was *de minimis,* in large part because Creenan testified that she refused to perform any political activities during the 2009 campaign. In particular, Creenan testified that she reluctantly performed various political activities during Orie Melvin's 2003 campaign, but this changed on Election Day in November 2003 when she refused to go to a poll site as directed by Janine Orie.[12] *Id.* at 1374. When Creenan learned in December 2008 that Orie Melvin intended to run again in the 2009 election, she testified that she went to Orie Melvin and informed her that what she had done in 2003 "can't happen in 2009" and made clear to Orie Melvin that she would no longer violate the 1998 Supreme Court Order prohibiting judicial employees from participating in political activity. *Id.* at 1384–86. As a result, when asked at trial about the six emails in question, Creenan testified that she had no specific information about the events at issue or had not performed the political tasks requested of her. *Id.* at 1414–30.

We likewise conclude that another email[13] was not prejudicial or the prejudice was *de minimis.* In this email, Audrey Denise Mackie (then using her maiden name Rasmussen), a member of Jane Orie's legislative staff, merely provided Janine Orie (at Orie Melvin's request) with the telephone number of someone who had expressed an interest in holding a fundraiser for Orie Melvin. N.T., 1/31/2013, at 824.

The three remaining emails introduced into evidence were cumulative of other evidence already introduced at trial. In an email dated September 28, 2009 to John Degener ("Degener"), who served as a member of Orie Melvin's

judicial staff from January 1998 through 2009, including as her Chief Law Clerk from 2004 through 2009, Orie Melvin asked Degener a question about summaries of certain pro-business decisions she had written or joined.[14] Degener testified only that he had received this email from Orie Melvin. N.T., 2/5/2013, at 1520. To the extent that this email reflected that Degener assisted Orie Melvin in the 2009 political campaign by preparing summaries of her prior judicial decisions, this evidence was merely cumulative of Degener's prior testimony that he performed various other political tasks for Orie Melvin's 2009 campaign, including (without reference to this particular email in question) the preparation of various summaries of her judicial decisions. *Id.* at 1499.

The final two emails at issue were to or from Pavlot. In an email dated August 6, 2009 (Exhibit 14, Tab 9), Pavlot forwarded to Orie Melvin another email concerning the taking of a family photograph and video that were subsequently used in campaign literature. N.T., 1/28/2013, at 229. In an email chain in September 2009 relating to a "gun bash" held by an organization with ties to the National Rifle Association (Exhibit 14, Tab 17), Pavlot suggested to Orie Melvin that 500 "poll cards" relating to her candidacy could be distributed to attendees, and Orie Melvin responded by inquiring whether Josh Dott ("Dott"), a junior member of Jane Orie's legislative staff, could attend the event to assist her in doing so. *Id.* at 246–48. These two emails, however, are merely cumulative of extensive testimony by Pavlot regarding a wide range of political activities she performed for the benefit of Orie Melvin's 2009 political campaign, *id.* at 207–362, including providing assistance to Orie Melvin at various other campaign events, *e.g., id.* at 212, 216, 263, solicitation at fundraisers, *id.* at 238, 258–60, 268, obtaining endorsements from influential political organizations, *id.* at 253, distributing poll cards, *id.* at 256, filming campaign commercials, *id.* at 228, and sending Dott and other legislative staff members to provide assistance at these activities, *id.* at 260, 267.

For these reasons, we conclude that the trial court's failure to suppress the 10 emails seized pursuant to the warrant for Orie Melvin's email accounts and their use at trial by the Commonwealth was harmless error, either because the emails were not prejudicial to Orie Melvin or the prejudice was *de minimis,* or because they were cumulative of other

> properly admitted evidence. Moreover, to the extent that
> these emails tend to prove that Orie Melvin diverted the
> services of members of her judicial staff and Jane Orie's
> legislative staff for the benefit of her 2009 political campaign,
> we note that the Commonwealth introduced into evidence an
> overwhelming quantum of other uncontradicted evidence,
> from numerous other witnesses and a large volume of other
> exhibits unrelated to the 10 emails in question, that likewise
> demonstrated Orie Melvin's diversion of services. Thus, the
> prejudicial effect of these 10 emails is insignificant by
> comparison and in our view could not have contributed to the
> verdict. As a result, no relief is due on Orie Melvin's third
> issue on appeal.

*Commonwealth v. Orie Melvin*, 103 A.3d at 20-22. Commonwealth Exhibit 102 (APP 2997-2998). Petitioner had a full opportunity to litigate her Fourth Amendment claims and no structural defect has occurred.   Simply arguing that the Pennsylvania court decided the claim incorrectly does not overcome *Stone v. Powell. Marshall v. Hendricks*, 307 F.3d at 82.

When deciding this claim under AEDPA, the federal courts must apply the presumption of correctness regarding factual and legal conclusions reached by the state courts as contained in 28 U.S.C.A. §2254 (d) and (e).

The state court's decision was not clearly contrary to federal law as determined by the Supreme Court of the United States. Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. at 698-699, 122 S.Ct. at 1852. Thus, petitioner would not be entitled to habeas relief. 28 U.S.C.A. §2254(d)(1); *Williams v.*

*Taylor*, *supra..*

### 4.     Orie Melvin was denied a fair trial as a result of the prosecutor's knowing introduction of false evidence.

Fourth, petitioner asserts that the prosecutor "knowingly introduced false evidence, tampered with evidence and suborned perjury from a key prosecution witness."  The claim is based on the prosecutor's mistaken belief that one exhibit, in a case with hundreds of exhibits, was a directive from petitioner to law clerk Lisa Sasinoski, Esquire to fill out a political questionnaire, when the directive really concerned a legitimate professional symposium that petitioner had agreed to attend.

The United States Court of Appeals for the Third Circuit has summarized the decisional law in the area of prosecutorial misconduct as follows:

> The conduct of the trial, including closing arguments, is regulated under the sound discretion of the trial judge. *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). But prosecutorial misconduct may "so infect []the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Such misconduct must constitute a "'failure to observe that fundamental fairness essential to the very concept of justice.'" *Id.* at 642, 94 S.Ct. 1868 (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Where "specific guarantees of the Bill of Rights are involved, [the Supreme] Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them," *id.* at 643, 94 S.Ct. 1868, but the test remains the same. *See Darden v. Wainwright*, 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), *reh'g denied*, 478 U.S. 1036, 107 S.Ct. 24, 92 L.Ed 774 (1986).

*Moore v. Morton*, 255 F.3d 95, 105-106 (3rd Cir. 2001).

Judge Nauhaus explained the issue and his ruling to deny the motion to dismiss, as follows:

During the direct testimony of Lisa Sasinoski, the Commonwealth entered into evidence without objection Exhibit 32, tab #19. (Transcript of Trial from January 24, 2013 through February 21, 2013 (hereinafter referred to as "TT") at 1180). This exhibit was a one-page handwritten document stating "Lisa Do you have proposed answers for Questions 3, 8, & 10? Also any suggestions on remaining questions that I can "chime" in on? Can I have this Monday.". (TT at 1181). Lisa Sasinoski testified the document was hand-written by the defendant, and she was being asked to answer questions 3, 8, &10 on a political questionnaire. Ms Sasinoski was asked "That would be an endorsement questionnaire of a special interest group?", and she replied "Yes". (TT at 1181). The Commonwealth then went on to ask questions about the next exhibit.

On cross-examination, Ms. Sasinoski was asked about a letter containing a page with eleven questions that at some point had been attached to the single handwritten document she had testified about on direct examination (Commonwealth Exhibit 32 tab#19). Ms. Sasinoski replied that she had not seen the eleven question document before. (TT at 120101203).

The next court day, the defendant filed a Defense Motion to Dismiss Criminal Charges Due to Prosecutorial Misconduct. The basis of the motion was that the testimony of Lisa Sasinoski was erroneous. The document she had testified about, Commonwealth Exhibit 32 tab#19, was actually written in 1998 and attached to a letter discussing an educational event at which the defendant was a panel member. This five page document was admitted into evidence as Defendant's Exhibit H. The 1998 letter included eleven questions labeled Proposed Questions For Professional Development Roundtable. The defendant's handwritten note was from 1998 and had requested information for a legal education event, not a political endorsement questionnaire, as Lisa Sasinoski had incorrectly testified to on direct examination.

The Court correctly ruled that it would not grant a mistrial on the exclusive basis of prosecutorial misconduct. A mistrial is appropriate only under manifest necessity; when an incident that occurred had the unavoidable effect of depriving the defendant of a fair trial. A prejudicial incident can be rectified by less drastic means than granting a

mistral.  *Commonwealth v. Collins,* __A.3d__, 2013 WL 3270834 (Pa. Super. 2013).

Prosecutorial misconduct had not occurred; rather what occurred had been a mistake, which was properly rectified with a curative instruction.  Prosecutorial misconduct occurs when the prosecutor's conduct changes from mere error to intentionally subverting the court process, resulting in the denial of a fair trial.  Prosecutorial misconduct that is intended to deny the defendant a fair trial or to provoke the defendant into moving for a mistrial will prohibit the retrial of a defendant and compel his discharge. *Commonwealth v. Smith,* 615 A.2d 321, 325 (1992). Prosecutorial misconduct involves intentional misconduct, which did not occur in the instant matter.

The disputed document, Defendant's Exhibit H, had been provided to the defense on August 21, 2012, and on October 2, 2012. (TT at 1238).  Thereafter, on or about January 4, 2013, the Commonwealth provided the defense with the documents they intended to use at trial, and somehow only the single handwritten page was there. Between October of 2012 and January of 2013, the give page document had somehow become the one page handwritten document.  The day before the Commonwealth entered Exhibit 32, tab 19 into evidence, it had provided a copy of the exhibit to the defense, containing the one page handwritten document as tab 19, and the defense did not object to this evidence. (TT at 1239).  This Court believed the defense knew all along and did not object to the exhibit because they were waiting to pounce. (TT at 1240).  This Court correctly ruled that prosecutorial conduct had not occurred. (TT at 1237).  The testimony of the witness was merely inaccurate and not perjury.  The defense knew the document was inaccurate but did not object to its admission into evidence.

This Court issued a curative instruction that the parties agreed upon. (TT at 1148).  This Court informed Ms. Sasinoski that her testimony was inaccurate and gave the jury a curative instruction that satisfied the defense and was appropriate considering the totality of the circumstances. (TT at 1254).  Any potential harm to the jury was cured by this Court's instruction to the jury.

Commonwealth Exhibit 73 at  9-12. (APP 2129-2132).

Assistant District Attorney Claus explained to the trial court how the mistake occurred and the direct examination of Attorney Sasinoski on this exhibit was brief. (TT 1180-1181).  Petitioner's counsel admitted that he knew something was wrong with the exhibit when it was being admitted but did not object. (TT 1243-1248) Judge Nauhaus conducted an extensive inquiry into how the mistake was made, which included an explanation from Assistant District Claus. (TT 1232-1255). Judge Nauhaus gave a curative instruction and petitioner's counsel indicated that he was satisfied with the instruction. (TT 1254-1255). In its final instructions the trial court told the jury that Attorney Sasinoski had given "inaccurate testimony" concerning this exhibit and they should consider the doctrine of "false in one, false in all" as to her testimony (TT 2806-2807).

Also, there was extensive testimony of other witnesses which established that filling out political questionnaires for petitioner on state time was a routine practice. (TT 1371-1389, 1410-1414, 1493-1497, 1499, 1510-1511, 1549, 1629-1630).  The aforementioned testimony included the following testimony from Molly Creenan, Esquire:

> Q      How long did you continue to receive directives telling you, or asking you, directing you, whatever it is, to do these questionnaires of a political nature?
>
> A      Up until the election, I believe.
>
> Q      Did you ever receive any kind of an admonition from Judge Joan Orie Melvin herself about you not wanting to do these political things?
>
> A      Yes.   One time when I wouldn't complete a questionnaire, the Judge faxed back to me the cover sheet of a questionnaire that said, "Are you above this.  Molly, are

you above this?"

Q        And it was clearly from Judge Joan Orie Melvin?

A        It was.

(TT 1388-1389).

Assistant District Attorney Claus, in a case that involved exhaustive exhibits, made a mistake. As found by Judge Nauhaus; it was not intentional.  The complexity of this case, as reflected in the breadth of the investigation, volume of evidence, number of witnesses, and novelty of the issues, caused mistakes to be made.

Finally, petitioner asserts misconduct as to some confusion which arose during Jamie Pavlot's testimony.  Attorney Brier was satisfied that cross-examination would be sufficient to deal with the issue and did not move for a mistrial.  Ms. Pavlot admitted that she had misspoke about the receipt and the fine. (TT 289-291, 458-461, 530-538, 548-563).  Judge Nauhaus did not err in ruling that these isolated evidentiary mistakes were not intentional and did not warrant either a mistrial or dismissal of charges.

On appeal, the Superior Court of Pennsylvania addressed the claim as follows:

> Given this authority, we focus not on the culpability of the prosecutor but rather on whether his actions deprived Orie Melvin of a fair trial by prejudicially rendering the jury incapable of fairly weighing the evidence and entering an objective verdict. Based upon our review of the certified record, we conclude that the trial court did not err in denying Orie Melvin's motion to dismiss. We do so for two reasons.
>
> First, the prejudice to Orie Melvin was minimal, as three other witnesses testified that law clerks were required to fill out political questionnaires. N.T., 2/5/2013, at 1380 (Creenan); 1493–94 (Degener); 1629 (Katherine Squires, hereinafter, "Squires").
>
> Second, the trial court took appropriate steps to reduce any prejudice to Orie Melvin. During Sasinoski's testimony before the jury, the trial court questioned

Sasinoski directly and made the jury aware of the issues with respect to the prior exhibit:

> [THE COURT]: Your testimony was inaccurate.

> [SASINOSKI]: Oh, okay.

> [THE COURT]: Okay. As a matter of fact, the document that it was attached to was a four page document from Buchanan Ingersoll, which is a major law firm in the City of Pittsburgh. They were doing a continuing legal education seminar. The Questions 3, 8, and 10 were proposed questions for the judge; is that not accurate?

> [SASINOSKI]: I don't have a recollection of that.

> [THE COURT]: Okay. This has been marked for identification.

> Ladies and gentlemen of the jury, you are to accept this as the document, this is the original document in which Tab 19 was, along with the attachment, which was submitted to Ms. Sasinoski whenever it was submitted. At the time that it was originally—the District Attorney was in possession of these additional pages, and they were not submitted to you during Ms. Sasinoski's testimony. Also be aware of the fact that [the] defense was in possession of these four pages. They knew they were attached. All right.

> There is a question as to how they were attached. It is the defense's belief that they were attached with a paper clip, or a staple, which is the way it is now, but when they got it, it was attached with a paper clip. And if you look at Tab 19, you will see that there is a paper clip. For whatever that means to you, take that.

> N.T., 2/4/2013, at 1253–55.

Moreover, during its charge to the jury, the trial court specifically advised the jury that Sasinoski had provided inaccurate testimony and gave a "false in one, false in all" instruction:

> One of the Commonwealth's witnesses, Lisa

Sasinoski, gave inaccurate testimony concerning a handwritten note which was marked and admitted into evidence as Commonwealth Exhibit 32, Tab # 19. Ms. Sasinoski testified related [*sic*] to a questionnaire from a special interest group when in fact it related to a continuing legal education seminar.

As has been pointed out by one of the attorneys, there is a rule in the law which I learned as *falsus in uno, falsus in omnibus,* which translated from Latin means false in one, false in all. If you decide that a witness deliberately testified falsely about a material point, that is about a matter that could effect [*sic*] the outcome of this trial, you may for that reason alone choose to disbelieve the rest of his or her testimony, but you are not required to do so. You should consider not only the deliberate falsehood, but also all other factors bearing on the witness' credibility in deciding whether to believe other parts of her testimony.

N.T., 2/15/2013, at 2806–08.

For these reasons, even to the extent that the prosecutor here committed intentional misconduct (rather than a mere mistake, as the trial court concluded), it was not error to deny Orie Melvin's motion to dismiss. The prejudice to Orie Melvin was minimal and the trial court took appropriate steps to clarify for the jury the precise nature of the issues relating to the handwritten note associated with the questionnaire.[18] Nothing in the certified record compels a conclusion that the jury was rendered incapable of fairly weighing the evidence and entering an objective verdict.

*Commonwealth v. Orie Melvin*, 103 A.3d at 27-28. Commonwealth Exhibit 102 (APP 3002).

When deciding this claim under AEDPA, the federal courts must apply the presumption of correctness regarding factual and legal conclusions reached by the state courts as contained in 28 U.S.C.A. §2254 (d) and (e).

The state court's decision was not clearly contrary to federal law as determined

by the Supreme Court of the United States. Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. at 698-699, 122 S.Ct. at 1852. Thus, petitioner would not be entitled to habeas relief. 28 U.S.C.A. §2254(d)(1); *Williams v. Taylor*, *supra*..

**5.     The requirement that Orie Melvin write letters of apology violates the Fifth Amendment.**

Finally, petitioner claims that the trial court's requirement that petitioner write letters of apology to all of the members of the Pennsylvania judiciary and her staff violated the Fifth Amendment.

The Commonwealth asserts that in a situation such as the present, where a criminal defendant voluntarily offers an apology during sentencing allocution in a public court of law and where a trial court merely requests that she disseminate that apology to others while issuing a directive that the apology can never be used against her, and where the Commonwealth's attorney agrees to that directive, there is no violation of one's right not to incriminate one's self.  The Commonwealth readily concedes that it is the unique nature of petitioner giving a public apology in open court that removes this case from constitutional impropriety.   In a situation where a defendant has not voluntarily apologized in a public courtroom and where a court wants to "put words into a non-apologetic" defendant's mouth, a constitutional violation would occur.

The Supreme Court of the United States has summarized the applicability of the

Fifth Amendment as follows:

> The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."   The essence of this basic constitutional principle is "the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut*, 367 U.S. 568, 581-582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961) (opinion announcing the judgment) (emphasis added).   See also *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596-1597, 12 L.Ed.2d 678 (1964);  E. Griswold, The Fifth Amendment Today 7 (1955).

> The Court has held that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault*, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967).

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872-1873 (1981).   Further, the

Supreme Court has held:

> It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details. See *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 95 L.Ed. 344 (1951). The privilege is waived for the matters to which the witness testifies, and the scope of the "waiver is determined by the scope of relevant cross-examination," *Brown v. United States,* 356 U.S. 148, 154-155, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). "The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry," *id.,* at 155, 78 S.Ct. 622. Nice questions will arise, of course, about the extent of the initial testimony and whether the ensuing questions are comprehended within its scope, but for now it suffices to note the general rule.

> [2] The justifications for the rule of waiver in the testimonial context are evident: A witness may not pick and choose

> what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry. As noted in *Rogers,* a contrary rule "would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony," 340 U.S., at 371, 71 S.Ct. 438. It would, as we said in *Brown,* "make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell," 356 U.S., at 156, 78 S.Ct. 622. The illogic of allowing a witness to offer only self-selected testimony should be obvious even to the witness, so there is no unfairness in allowing cross-examination when testimony is given without invoking the privilege.

*Mitchell v. United States*, 526 U.S. 314, 321-322, 119 S.Ct. 1307, 1311-1312 (1999).

However, the Supreme Court has concluded as follows:

> It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final. See, *e.g., Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960). If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared.

*Mitchell v. United States*, 526 U.S. at 326, 119 S.Ct. at 1314. Consequently, once a judgment of sentence is final, the privilege ends as well.

On May 7, 2013, at sentencing, petitioner made the following statement in allocation:

> THE COURT:  (…)  Joan Orie Melvin, you have an absolute right of allocution.  Is there something you want to say?
>          *           *           *         *
> DEFENDANT ORIE MELVIN:  Judge, the most important job I've ever held in my entire life is that as of a mother to my five daughters and my son.  I have always prided myself in being a role model to my children.
>
> And I am sorry for all the loss, suffering, and pain you

have endured for the past five years.

> I'm saddened and sorry for the circumstances that bring me before the Court today.  And I am prepared for sentencing by the Court.

(ST1 35).  Assistant District Attorney Claus asked that petitioner be sentenced to incarceration. (ST1 39-43).  In response, Judge Nauhaus reviewed all of the letter that he received on petitioner's behalf, her career, the trial of victims, and crime. (ST1 44-53). Judge Nauhaus stated he was known as a lenient sentencing judge and that although there was a strong argument for incarceration, he had crafted a sentence that he thought was fair. (ST1 53).  It was Judge Nauhaus' belief that petitioner's criminality was fueled by her arrogant pride and that working in a soup kitchen and sending out an apology would be instrumental in her rehabilitation. (ST1 62-64).

Petitioner's in-court apology is already a fact, which can never be denied and for which she can always be questioned.  She did it voluntarily.  She did it while standing next to counsel.  Requiring her to extend it to others (members of her staff who were victimized by her criminal conduct and members of the Pennsylvania Judiciary), as a necessary and reasonably related condition of the rehabilitative process of county intermediate punishment, which the trial court was certainly allowed to do pursuant to 42 Pa.C.S.A. §9763(b)(15), does not constitute compelled self-incrimination.

Judge Nauhaus has issued an Order directing that these letters of apology cannot ever be used against petitioner at a new trial:

> THE COURT:  (…)  Insofar as the letters are concerned and the pictures are concerned, while I believe it should go without saying, I need to get this on the record, in the event that this matter goes to appeal and there is a new sentence granted, those letters and those pictures may not be used by the government insofar as evidence is concerned.  I think

> that should go without saying since it's an Order of Court.
> It's not something that's voluntarily done.  But I want it very,
> very clear.  Do you understand that, Mr. Claus?
>
> MR. CLAUS:  I do.

(ST2 4).  Petitioner has no reasonable fear that her letters of apology will subject her to compelled self-incrimination; not only because she is not being forced to provide a confession or make an admission of guilt, but also because she has already uttered an apology.

Petitioner's Fifth Amendment rights were not violated in this case, because the judgment is final. *Mitchell v. United States*, *supra*.   Moreover, petitioner has subsequently further waived this right her Praecipe for Discontinuance of Petition for Allowance of Appeal, which stated in a footnote:

> In discontinuing her Petition for Allowance of Appeal,
> Petitioner fully understands that she is abandoning her
> challenge to the legality of the sentence as defined by the
> Pennsylvania Superior Court in the decision dated August
> 21, 2014. See Commonwealth v. Orie Melvin, No. 844 WDA
> 2013, 2014 WL 4100200 (Pa.Super.Ct. Aug 21, 2013).
> Accordingly, Petitioner understands that her Motion for Stay
> of said sentence will be rendered moot. She is therefore fully
> prepared to serve the sentence authorized by the Superior
> Court in its entirety.

Commonwealth Exhibit 111 at footnote 1. (APP 3408). Further, petitioner has completed all of the apology letters and mailed them. (A copy of her certification is attached hereto, incorporated herein, and marked as Commonwealth Exhibit 112) (APP 3417-3418). Consequently, there is no violation of the Fifth Amendment to correct, and if there was, there is no remedy.

On appeal, the Superior Court of Pennsylvania addressed the Fifth Amendment claim as follows:

> First, in *Commonwealth v. Melvin,* 79 A.3d 1195 (Pa.Super.2013), this Court granted Orie Melvin's request for a stay from the apology letters requirement on constitutional grounds, indicating that said stay would remain in effect "until such time as her direct appeal in this Court has been decided" and "pending final resolution by this Court of her claims of illegality of sentence." *Id.* at 1202, 1203. Apparently, she now seeks to extend the stay indefinitely, arguing that "[a]s long as Orie Melvin continues to assert her innocence, she cannot be required to apologize." Orie Melvin's Brief at 95. We cannot agree. In *Melvin,* this Court reviewed applicable decisions of our Supreme Court and determined that the requirement that she write apology letters violated her right against self-incrimination during the pendency of her direct appeal. *Id.* at 1203. We are aware of no federal or Pennsylvania state law, and Orie Melvin has not cited to any, that supports the notion that the right against self-incrimination extends beyond the pendency of a direct appeal. As a result, we must conclude that Orie Melvin is not entitled to relief from the apology letters requirement on constitutional grounds after her direct appeal has been decided.

*Commonwealth v. Orie Melvin*, 103 A.3d at 51. Commonwealth Exhibit 102 (APP 3018-3019).

When deciding this claim under AEDPA, the federal courts must apply the presumption of correctness regarding factual and legal conclusions reached by the state courts as contained in 28 U.S.C.A. §2254 (d) and (e).

The state court's decision was not clearly contrary to federal law as determined by the Supreme Court of the United States. Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. at 698-699, 122 S.Ct. at 1852. Thus,

petitioner would not be entitled to habeas relief. 28 U.S.C.A. §2254(d)(1); *Williams v. Taylor*, *supra*..

WHEREFORE, on the basis of the foregoing, the Commonwealth respectfully requests that this petition be dismissed and a certificate of appealability be denied.

Respectfully submitted,

STEPHEN A. ZAPPALA, JR.
DISTRICT ATTORNEY

By:     s/ Ronald M. Wabby, Jr.
        RONALD M. WABBY, JR.
        DEPUTY DISTRICT ATTORNEY
        PA I.D. 81166

## INDEX TO COMMONWEALTH EXHIBITS

**EXHIBIT**                                          **PAGE NUMBER**

**VOLUME II**

| | |
|---|---|
| Commonwealth Exhibit 1 | 1-24 |
| Commonwealth Exhibit 2 | 25-31 |
| Commonwealth Exhibit 3 | 23-33 |
| Commonwealth Exhibit 4 | 34-39 |
| Commonwealth Exhibit 5 | 40-59 |
| Commonwealth Exhibit 6 | 60-67 |
| Commonwealth Exhibit 7 | 68 |
| Commonwealth Exhibit 8 | 69-75 |
| Commonwealth Exhibit 9 | 76-140 |
| Commonwealth Exhibit 10 | 141-147 |
| Commonwealth Exhibit 11 | 148-152 |
| Commonwealth Exhibit 12 | 153-169 |
| Commonwealth Exhibit 13 | 170-173 |
| Commonwealth Exhibit 14 | 174-181 |
| Commonwealth Exhibit 15 | 182-192 |
| Commonwealth Exhibit 16 | 193-197 |
| Commonwealth Exhibit 17 | 198-221 |
| Commonwealth Exhibit 18 | 222-230 |
| Commonwealth Exhibit 19 | 231 |
| Commonwealth Exhibit 20 | 232 |
| Commonwealth Exhibit 21 | 233 |

## VOLUME III

Commonwealth Exhibit 22                                    234-273

Commonwealth Exhibit 23                                    274-318

Commonwealth Exhibit 24                                    319-320

Commonwealth Exhibit 25                                    321-322

Commonwealth Exhibit 26                                    323-340

Commonwealth Exhibit 27                                    341-384

Commonwealth Exhibit 28                                    385-423

Commonwealth Exhibit 29                                    424-430

Commonwealth Exhibit 30                                    431-434

Commonwealth Exhibit 31                                    435-436

Commonwealth Exhibit 32                                    437-463

Commonwealth Exhibit 33                                    464-468

Commonwealth Exhibit 34                                    469-472

## VOLUME IV

Commonwealth Exhibit 35                                    473-705

## VOLUME V

Commonwealth Exhibit 36                                    706-712

Commonwealth Exhibit 37                                    713-720

Commonwealth Exhibit 38                                    721-722

Commonwealth Exhibit 39                                    723-731

Commonwealth Exhibit 40                                    732-848

Commonwealth Exhibit 41                                    849-875

Commonwealth Exhibit 42                                                    876-893

**VOLUME VI**

Commonwealth Exhibit 43                                                    894-9333

Commonwealth Exhibit 44                                                    934-942

Commonwealth Exhibit 45                                                    943-996

Commonwealth Exhibit 46                                                    997-1007

Commonwealth Exhibit 47                                                    1008-1016

Commonwealth Exhibit 48                                                    1017-1036

Commonwealth Exhibit 49                                                    1037-1039

Commonwealth Exhibit 50                                                    1040-1060

Commonwealth Exhibit 51                                                    1061-1073

Commonwealth Exhibit 52                                                    1074

Commonwealth Exhibit 53                                                    1075

Commonwealth Exhibit 54                                                    1076-1084

Commonwealth Exhibit 55                                                    1085-1092

Commonwealth Exhibit 56                                                    1093-1117

Commonwealth Exhibit 57                                                    1118-1129

Commonwealth Exhibit 58                                                    1130-1137

Commonwealth Exhibit 59                                                    1139-1143

**VOLUME VII**

Commonwealth Exhibit 60                                                    1144-1419

**VOLUME VIII**

Commonwealth Exhibit 60 cont.                                             1420-1603

**VOLUME IX**

Commonwealth Exhibit 60 cont.                    1604-1831

**VOLUME X**

Commonwealth Exhibit 61                          1832-1839

Commonwealth Exhibit 62                          1840-1880

Commonwealth Exhibit 63                          1881

Commonwealth Exhibit 64                          1882-1986

Commonwealth Exhibit 65                          1987-2039

Commonwealth Exhibit 66                          2040-2045

Commonwealth Exhibit 67                          2046-2063

Commonwealth Exhibit 68                          2064-2086

**VOLUME XI**

Commonwealth Exhibit 69                          2087-2104

Commonwealth Exhibit 70                          2105-2110

Commonwealth Exhibit 71                          2111-2114

Commonwealth Exhibit 72                          2115-2119

Commonwealth Exhibit 73                          2120-2151

Commonwealth Exhibit 74                          2152-2160

Commonwealth Exhibit 75                          2161-2301

Commonwealth Exhibit 76                          2302-2310

Commonwealth Exhibit 77                          2311

Commonwealth Exhibit 78                          2312-2331

Commonwealth Exhibit 79                          2332-2342

Commonwealth Exhibit 80                                    2343-2351

Commonwealth Exhibit 81                                    2352-2353

**VOLUME XII**

Commonwealth Exhibit 82                                    2354-2397

Commonwealth Exhibit 83                                         2398

Commonwealth Exhibit 84                                    2399-2400

Commonwealth Exhibit 85                                    2401-2593

**VOLUME XIII**

Commonwealth Exhibit 86                                    2594-2702

Commonwealth Exhibit 87                                    2703-2751

Commonwealth Exhibit 88                                    2752-2776

Commonwealth Exhibit 89                                    2777-2779

Commonwealth Exhibit 90                                    2780-2786

Commonwealth Exhibit 91                                    2787-2791

Commonwealth Exhibit 92                                    2792-2797

Commonwealth Exhibit 93                                    2798-2802

Commonwealth Exhibit 94                                    2803-2810

Commonwealth Exhibit 95                                    2811-2812

Commonwealth Exhibit 96                                         2813

Commonwealth Exhibit 97                                    2814-2878

**VOLUME XIV**

Commonwealth Exhibit 98                                    2879-2909

Commonwealth Exhibit 99                                    2910-2922

Commonwealth Exhibit 100                                      2933-2973

Commonwealth Exhibit 101                                      2972-2978

Commonwealth Exhibit 102                                      2979-3028

Commonwealth Exhibit 103                                      3029-3031

Commonwealth Exhibit 104                                      3032-3034

**VOLUME XV**

Commonwealth Exhibit 105                                      3035-3243

**VOLUME XVI**

Commonwealth Exhibit 106                                      3244-3385

Commonwealth Exhibit 107                                      3386-3403

Commonwealth Exhibit 108                                            3404

Commonwealth Exhibit 109                                      3405-3406

Commonwealth Exhibit 110                                      3407-3414

Commonwealth Exhibit 111                                      3415-3416

Commonwealth Exhibit 112                                      3417-3418

<u>PROOF OF SERVICE</u>

I, the undersigned authority, hereby certify that on this 16th day of November, 2015, filed the foregoing with the Clerk of Court using the CM/ECF system, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants named below.

By:    s/ Ronald M. Wabby, Jr.
RONALD M. WABBY, JR.
DEPUTY DISTRICT ATTORNEY
PA I.D. 81166

Office of the District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA 15219
(412) 350-4377
e-mail: rwabby@da.allegheny.pa.us

cc:    Amy Zapp, Esquire
Chief Deputy Attorney General
Special Litigation Section
16th Floor, Strawberry Square
Harrisburg, PA 17120

The Honorable Robert C. Mitchell
United States Magistrate Judge
United States Courthouse
700 Grant Street, Suite 9240
Pittsburgh, PA 15219